O. A. KIRKCONNELL, Jr., and W. J. Godfrey, d/b/a Kirkconnell & Godfrey

v.

The UNITED STATES.

Harris FALGOUT, Harris Falgout, Jr., Louella F. Lemkowitz and M. F. Callais, t/a Grande Valley Boat Company

v.

The UNITED STATES.

Nos. 31–62, 142–62.

United States Court of Claims.

June 11, 1965.

Joseph J. Lyman, Washington, D. C., for plaintiffs.

Mitchell Samuelson, Washington, D. C., with whom was Asst. Atty. Gen., Louis F. Oberdorfer for defendant. C. Moxley Featherston, Lyle M. Turner and Philip R. Miller, Washington, D. C., were on the brief.

Before LARAMORE, Acting Chief Judge, DURFEE, DAVIS and COLLINS, Judges, and JONES, Senior Judge.

DURFEE, Judge.

These tax refund cases involve similar questions of law and fact, and were therefore consolidated by agreement of the parties. Plaintiffs have brought these actions to recover taxes alleged to have been erroneously paid under the Federal Insurance Contributions Act (FICA), 26 U.S.C. § 3101 et seq., and the Federal Unemployment Tax Act (FUTA), 26 U.S.C. § 3301 et seq., for the quarter ending March 31, 1957, through March 31, 1960. Only that portion of the FICA taxes, an excise tax paid by plaintiffs, is sought to be refunded. No part of the fishermen's FICA taxes, an income tax, is sought to be refunded here. The FUTA tax, an excise tax paid by plaintiffs without contribution by the fishermen, is also sought to be refunded for the years 1957, 1958, and 1959.

Plaintiffs in each case are separate and distinct partnerships.[1] Both plaintiffs were engaged in the period involved here in the business of fishing for shrimp in the Gulf of Mexico, and their headquarters were in Brownsville, Texas. Plaintiffs were the owners of small fleets of fishing boats. The boats were manned by a captain and a small crew of deckhands who also performed fishing services on the boats. The sole issue involved in this case is whether these latter individuals, the captains and deckhands, were employees of plaintiffs under Sections 3121(d) and 3306(i) of the Internal Revenue Code of 1954, 26 U.S.C. §§ 3121(d) and 3306(i), (Supp. V, 1952),[2] or whether they were independent contractors. If the captains and deckhands were employees within the meaning of the applicable sections of the 1954 Code, then plaintiffs rightfully paid the taxes in issue and they are not entitled to a refund. If, on the other hand, these captains and deckhands were independent contractors, then the FICA and FUTA taxes were erroneously assessed against plaintiffs, and plaintiffs are entitled to a tax refund.

Plaintiffs' shrimp boats were quite expensive commodities, costing about $40,-000.00 each. The boats were specifically equipped and were owned and operated solely for shrimp fishing. Maintenance workers, whose status is not in issue here, were hired by plaintiffs to keep the vessels and fishing gear in operating condition between trips. These workers were paid regular wages and worked under the direct supervision of plaintiffs' managers.

\* \* \* \* \*

§ 3306. *Definitions*.

\* \* \* \* \*

(i) *Employee*.

For purposes of this chapter, the term "employee" includes an officer of a corporation, but such term does not include—

(1) any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an independent contractor, or

(2) any individual (except an officer of a corporation) who is not an employee under such common law rules.

---

1. The Kirkconnell and Godfrey partnership in No. 31–62 was dissolved in 1962, subsequent to the period involved in this litigation.

2. The definitions of employees in these two sections of the 1954 Code are as follows:

§ 3121. *Definitions*.

\* \* \* \* \*

(d) *Employee*.

For purposes of this chapter, the term employee means—

\* \* \* \* \*

(2) any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee; or

After a boat had been outfitted and equipped, plaintiffs selected an experienced fisherman who was placed in command of the boat as captain. The captains so selected were those in whose ability, production records, and integrity plaintiffs had confidence. It was understood by plaintiffs and the captains that the captains were to be in full charge of the fishing operations. Plaintiff in No. 31–62 had a written agreement setting out the working conditions with its captains. The specifics of the agreement are outlined in Finding 12. This agreement resulted from negotiations between the owners and the Rio Grande Shrimp Fishermen's Association, the authorized representative of the fishermen and the captains for a number of years prior to the time the agreement was adopted. Not all the captains signed the agreement; this factor is insignificant, however, as many of the provisions of the agreement were rarely enforced, and the general practice of the trade governed. The actual manner in which both plaintiff partnerships conducted business was similar for all practical purposes.

Plaintiffs did not allow the captains to have or permit intoxicating liquor aboard the vessels. The captains were instructed by the owners to avoid any violation of Mexican territorial waters, and to refrain from entering Mexican ports except in emergencies. When a vessel was at sea, the crew of the boat was under the direct and sole control of the captain. The captains usually made the decisions where to fish and in what direction to go, but if a boat was not in safe mechanical condition for long distance fishing, the owner would tell the captain to fish "just off the bar." In addition, the owners passed on to the captains information obtained as to where fish were being caught. However, the captains were not called in, nor interrupted during their fishing operations. The captains were in complete charge of the boats concerning all matters of operation and maintenance from the time of departure until the boats returned. Once the boats left port the captains were not required nor expected to communicate with plaintiffs with any degree of frequency. Contact between the captains and plaintiffs was infrequent and usually limited to emergencies.

The arrangement between the boat owners and the captains did not specify a term during which a captain would remain in command of a vessel. The parties understood that a captain would be in command of the vessel on a trip to trip basis, and the arrangement could be terminated by either party at the conclusion of any trip or prior to the commencement of another. There was nothing in the arrangement that prohibited a captain from taking a vessel belonging to another owner and thereafter returning to plaintiffs for a boat, and in fact, some captains did just that. However, the relationship was customarily continued for an extended time, and a number of captains made many consecutive trips in command of the same boats for the same plaintiffs. Plaintiffs attempted to keep their vessels in operation as often as was consistent with the condition of the vessel. Usually two or three days elapsed between trips.[3] If a captain was not ready or available to ship out when the boat was equipped to go, plaintiffs would select another captain to take over command of the vessel. The captains so replaced could and thereafter often did take out other boats owned by plaintiffs.

Under the agreement between plaintiffs and the captains, the latter worked or fished the boats on the lay or share basis in accordance with the custom of the fishing industry. In the early portion of the period herein involved, the proceeds from the sale of shrimp from each trip were divided equally between plaintiffs and the captains. During the latter portion of the period each catch was divided 60 percent to plaintiffs and

3. A trip to Texas waters would last from three to eight days. If a vessel fished off Campeche, Mexico, the trip might last as long as 60 days.

40 percent to the captains. The captains paid the deckhands on a share basis out of their portion of the share of the catch.

The deckhands were hired and fired by the captains, who determined the length of time they would work and their duties. However, the owners could request that certain individuals not be hired, which requests were complied with. Plaintiffs themselves had no direct relationship with the deckhands. Generally, prior to sailing, however, plaintiffs knew the names of the crew.

Various expenses were incurred in connection with a fishing trip. Some were paid by plaintiffs, and some by the captains and crew. The crew paid for groceries, one-half of the ice, and all personal items. In addition, the crew paid for shoveling the shrimp out of the holds and the expense of employing a guard to protect the catch when the boat was not to be immediately unloaded. The cost of processing the shrimp was deducted from the gross price before the shares were disbursed. All other expenses, including fuel, were paid by plaintiffs.

The captains decided how much fuel and ice to take aboard. The captains, when placed in command of a boat, customarily asked plaintiffs where to obtain the fuel and ice. Plaintiffs told the captains to purchase from Valley Fuel and Ice Company. In all instances, the cost of both the fuel and the ice was charged to plaintiffs. However, the cost of one-half the ice was later deducted from the captain's share.

The captains, on the other hand, could purchase groceries from stores of their choice. However, in most instances the groceries were bought on credit at stores where plaintiffs had credit. The cost of the groceries was then later deducted by plaintiffs from the captain's share.

Each trip was considered by the parties as a separate transaction for purposes of settlement. The amount received by the captain and crew depended entirely on the proceeds of the shrimp catch. There was no guarantee of any kind made by plaintiffs to the captain regardless of the time and effort expended in fishing. If a trip was unsuccessful, it was known in the trade as a "broker." If the value of the captain's share of a catch would not cover his share of the expenses, the remainder would be taken out of the captain's share from subsequent trips. When a captain, owing unpaid expenses, failed to ship out for plaintiffs on subsequent trips, the unpaid expenses of the "broker" were borne by plaintiffs.

Plaintiffs and the captains had an understanding that the shrimp would be unloaded by Basin Seafood Company, a Brownsville, Texas company partially owned by another Brownsville company, Western Shell Fish Company, Inc. Western would then purchase the unloaded catch. One member of each of the two partnerships held substantial interests in Western. Sometimes necessity dictated that the captain go to another port along the Texas or Louisiana coast. However, when the shrimp were unloaded at a port other than Brownsville, they were sold to fish houses which had been designated by plaintiffs prior to the beginning of the trip, and with whom plaintiffs had credit arrangements. Apparently, only when the captains fished off the coast of Mexico could they send a catch to a port of their choice.

After the shrimp were unloaded, they were sent to the aforementioned Western Shell Fish Company to be weighed. The captains had a right to be present when the shrimp were weighed, but they were seldom present. Usually, therefore, neither the captain nor the crew knew how much they earned on a trip until they received a settlement sheet and a check from Western's bookkeeper, who had been authorized by plaintiffs to keep their books of account and write their checks. The bookkeeper was compensated for these services by plaintiffs. When the bookkeeper received the gross amount of the sale of the shrimp, he deducted the cost of the ice and divided the remainder into plaintiffs' share and the captain's and crew's share. From the captain's

and crew's share, the bookkeeper also deducted grocery bills, unloading fees, guard fees, union dues, and dues to the Texas Shrimp Association.[4] The evidence shows that there was no authorization by the captains or crewmen for the deduction of union dues and Shrimp Association dues. The checkoff for the union dues was made pursuant to an agreement with the union. The deduction for the Shrimp Association dues was made as a result of an agreement entered into between the union and the boat owners.

Occasionally, when the owners had a successful year, they paid year-end or Christmas bonuses to some of their captains. The owners also frequently made advances as loans to the captains and crewmen. The amounts so advanced were deducted from the amount due the individuals at the time settlement was made after a fishing trip.

The owners carried hull insurance as well as protection and indemnity insurance. All repairs and maintenance of the vessels were the responsibility of the owners, and they made the final decisions in these matters.

We have thus attempted to delineate with some elaboration the relationship between the owners and the captains and crewmen. We believe that a thorough discussion of their relationships in context with the workings and customs of the shrimp fishing industry is necessary in order to get the true flavor of this case, and to make the necessary and correct legal determination.

Before beginning our analysis of the facts, one further factor remains to be mentioned. In 1961, plaintiff in No. 31–62 in defending a libel action in admiralty in the District Court of Texas, Brownsville Division, alleged that it "hires the captains on each and every boat operated by the partnership," under a contract substantially the same as the written agreement hereinbefore discussed. This important factor will also be discussed in our analysis of the facts.

Sections 3121(d) and 3306(i) of the 1954 Code (see Footnote 2, supra) tell us that the usual common law rules are to be adopted for ascertaining the existence of the employer-employee relationship, or of independent contractor status. The vital factor is, therefore, under the common law whether the person performing the services for another is subject to the other's control or right to control, or whether under the common law such person is an independent contractor. The Treasury Regulations applicable to § 3121(d) of the 1954 Code speaks in the same vein.[5] Cf. 26 CFR 31.3121(d)–1.

▪ There are various guidelines used to determine whether or not there is control or right to control in such a situation as we are confronted with here. As we stated in Cape Shore Fish Co. Inc. v. United States, Ct.Cl., 330 F.2d 961, 964–965, decided April 17, 1964. * * * "Degrees of control, opportunities for profit or loss, investment in facilities, permanency of relation and skill required are important in determining status as employee or independent con-

4. The Texas Shrimp Association was a trade association composed of suppliers to the industry, boat owners, processors and some captains.

5. § 31.3121(d)–1 *Who are employees—*
    \*     \*     \*     \*     \*
   (c) *Common law employees.* (1) Every individual is an employee if under the usual common law rules the relationship between him and the person for whom he performs services is the legal relationship of employer and employee.
   (2) Generally such relationship exists when the person for whom services are per-

formed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. * * *

tractor, but no one factor is controlling nor are these factors exclusive." * * * It is the overall situation that governs, not the presence or absence of any one factor. Other factors indicative of the presence or absence of the employer-employee relationship which may be considered in viewing the overall situation are the extent of control the employer exercises over the details of the work, amount of supervision, degree of skill required for the work, length of employment, method of payment, and how the parties themselves view the relationship. Cf. Restatement of the Law, Agency, 2d, § 220.

▆▆ Both parties to this controversy have supplied the court with numerous citations supporting their contentions.[6] While these cases are valuable in illustrating the difficulty and closeness of the problem before us, they cannot be used in a dispositive manner to rid ourselves of the responsibility of determining the existence or absence of the employer-employee relationship. For as we stated in Cape Shore Fish Co. Inc., v. United States, supra, at p. 965 of 330 F.2d, "* * * The result in each case must be governed by the special facts and circumstances of the case itself." * * * The Treasury Regulations bear this out.[7] Cf. 26 CFR 31.3121(d)–1.

▆▆ Upon close consideration of the salient facts in this case we are of the opinion that the owner-plaintiffs possessed a right to control the captains and deckhands in the degree necessary to establish an employer-employee relationship.[8] Plaintiffs, therefore, correctly paid the FICA and FUTA taxes in accordance with their roles as employers of the captains and deckhands, and may not now recover these taxes.

The first important factor in the analysis of the relationship of these owners and the captains and deckhands is the amount of investment in the facilities. The costs to plaintiffs were greatly disproportionate to the costs to the fishermen. Plaintiffs' boats alone cost $40,-000.00 each. Plaintiffs paid the cost of keeping the vessels and fishing gear in operating condition between trips. Plaintiffs paid for all repairs and maintenance of the boats, and for the cost of all insurance, including hull, liability and indemnity. As opposed to these great expenses the fishermen paid for only one-half the ice, personal items, the cost of shoveling shrimp and employing guards. All other expenses, including fuel, were paid by plaintiffs. It is improbable, although admittedly not inconceivable, that plaintiffs with such a great amount of investment at stake, were willing to divest themselves of employers' control or to entrust this large investment solely to the control of a number of independent contractors.

---

6. Plaintiffs especially rely upon Williams Packing and Nav. Co. v. Enochs, 176 F.Supp. 168 (S.D.Miss.1959), aff'd 291 F.2d 402 (5th Cir. 1961), rev'd on jurisdictional grounds, 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962); Crawford Packing Co. v. United States, 330 F.2d 194 (S.D.Texas, 1962), Civil No. 2773, Vol. 1 Unemp.Ins.Rept. (CCH, 1962) Fed. ¶14,451; Star Fish and Oyster Co. v. United States, (S.D.Ala., 1963) Civil No. 2633, 1 Unemp.Ins.Rept. (CCH, 1963) Fed. ¶16,061.

Defendant's main authority is Cape Shore Fish Co. v. United States, supra; Capital Trawlers Inc. v. United States, 216 F.Supp. 440 (Maine, 1963), aff'd 324 F.2d 506 (1st Cir., 1963); O'Hara Vessels, Inc. v. Hassett, 60 F.Supp. 672 (Mass., 1942).

7. § 3121(d)–1 *Who are employees—*
   *      *      *      *      *
  (c) *Common law employees—*
   *      *      *      *      *

(3) Whether the relationship of employer and employee exists under the usual common law rules will in doubtful cases be determined upon an examination of the particular facts of each case.

8. Our discussion will mainly concern itself with the relationship between the plaintiffs and captains. The deckhands were hired by and were under the control of the captains, and since the greater includes the lesser, a designation of employee assigned to the captains would logically extend the same designation to the deckhands.

There were certain specific restrictions placed on the captains by plaintiffs. These restrictions are consistent with an employer-employee relationship, and included prohibition of liquor on board the boats, instructions to avoid Mexican waters and ports, and instructions on where to fish if the boat was not in safe mechanical condition.

The captains' autonomy while at sea was not incompatible with the employer-employee relationship. They were presumably hired for their expertise in fishing matters and such freedoms allowed the captains complete charge of the boats while at sea; the decisions as to where to fish, and no requirement for communication with plaintiffs were merely expedient means by which plaintiffs derived the full benefit of the captains' expertise.

This derivation of benefit of expertise is again shown by the fact that the captain was allowed to hire the crew. Certainly, plaintiffs would have been impractical had they thrust upon a captain a crewman who would have been incompatible with the captain. Further, the captains, not plaintiffs, were in a better position to know which crewmen were the more efficient and better workers. However, even in this area, there was a certain amount of control by plaintiffs. The owners had the power to request that certain individuals not be hired, and these requests were complied with.

We believe there was a definite object of continuity of employment between plaintiffs and the captains. While it is true there was no specific term during which a captain would remain in command of a vessel and the captains could quit after the conclusion of any trip and work for another owner, in actuality the relationship was customarily continued for an extended time and a number of captains made many consecutive trips. As we earlier pointed out, continuity of employment is one of the factors to con-

sider in determining the existence of an employer-employee relationship. The continuity of employment is further demonstrated by the practice of reimbursement of a "broker." When the value of a captain's share of a catch would not cover his share of the expenses, the remainder was taken out of a captain's share from subsequent trips. If plaintiffs did not expect the captain to return for subsequent trips, it would seem probable that they would have demanded payment for unpaid expenses at the end of each trip.[9]

There were other areas in which plaintiffs exercised their control. They told the captains when to purchase food and fuel. Plaintiffs' credit was used by the captains in such purchases, and also in purchases of groceries. It was thus plaintiffs, and not the captains, whose good names and credit were at stake, and who had to guarantee payment to the merchants. A further element of control exercised by plaintiffs pertained to the choice of fish houses for unloading the shrimp. When the shrimp were unloaded at a port other than Brownsville they were sold only to fish houses which had been designated by plaintiffs prior to the beginning of the trip. It was only when the captains fished off the coast of Mexico that the captains could send a catch to a port of their choice.

Another factor indicating that plaintiffs were employers was that payment to the captains and crews was made by an authorized agent of plaintiffs. Compensation to the fishermen was paid by plaintiffs' checks drawn on plaintiffs' banks, and not by the buyer's checks. The captains and crews did not even know how much they earned on a trip until plaintiffs' agent paid them by check.

█ It is time settled law that the lay or share method of payment does not weaken or change the existence of an employer-employee relationship. The lay system of payment is an ancient custom of the fishing industry. Cf. Cape Shore

9. When a captain failed to ship out on a subsequent trip, plaintiffs paid the captain's share of the unpaid expenses. It is not conceivable to us that the debts of an independent contractor would be borne by plaintiffs. On the other hand, those of an employee would be more apt to be absorbed.

Fish Co., supra, 330 F.2d p. 968 and cases and treatises cited therein.

It is our view that plaintiffs and captains and crews themselves believed that their respective status was that of employer and employee. First, there was an authorized representative union of the fishermen and captains. The union and plaintiff in No. 31–62 negotiated an agreement which set out certain working conditions. While it is true that not all the captains signed the agreement, and it was rarely enforced, we believe that its mere existence is all important. There would have been no agreement had there been no union. The presence of a union shows that the fishermen and captains believed themselves to be in a subordinate status to the owners rather than equals as independent contractors. They felt the need to act in unity against what must have been regarded as the colossus of management.

The presence of the union acting as *representative of a group of employees* is further shown by the fact that union dues were deducted from the captains' and crewmen's shares. There was no direct authorization by the captains and crewmen for the deductions. Instead, the authorization came from the union pursuant to an agreement between the union and plaintiffs. Further evidence of union solidarity and bargaining is drawn from the fact that dues to the Texas Shrimp Association were also deducted from the captains' and crews' shares, again as a result of an agreement between the union and boat owners.

Other evidence of the parties' belief in the existence of the employer-employee relationship consists of the Christmas bonuses, payment of insurance and one plaintiff's admissions. Year-end or Christmas bonuses are not ordinarily paid to independent contractors, but are frequently paid to employees. Plaintiffs, therefore, in paying these bonuses undoubtedly regarded the captains as employees. Plaintiffs, in carrying the indemnity and protection insurance, undoubtedly recognized their responsibility as employers and, *a fortiori*, the captains

in acquiescing in this arrangement, realized these matters were not within their cognizance as mere employees. Finally, plaintiff in No. 31–62, in defending a libel action in admiralty specifically stated that it "hires" each captain. "Hires" is not a word of art. It is an act an employer performs in obtaining an employee. Independent contractors are not "hired." They are contracted for, or with.

Accordingly, based on all the above mentioned factors which we have considered in our attempt to establish the overall situation in regard to the relationship of the parties, we hold that the captains and crewmen were employees of plaintiffs. Plaintiffs, therefore, rightfully paid the taxes in issue and are not entitled to a refund. The petitions are dismissed.

JONES, Senior Judge (concurring in the result).

This is a very close case. It is true that there are elements of similarity between the facts of this case and Cape Shore Fish Co., Inc. v. United States, 330 F.2d 961, decided April 17, 1964, on which the defendant relies and which is cited in the majority opinion. However, there are several vital differences between the two cases which will be discussed briefly.

This case is much more like the situation of an independent contractor or a charter boat contract than was the relationship in the Cape Shore decision.

I am persuaded to believe that most of the restrictions in the instant case were the natural ones that would be written by any careful owner into a contract; restrictions that would be mainly for the protection of the owner's property. For instance, the right to forbid the taking of liquor onto a ship, that for an indefinite period of time would be completely out of the supervision and control of an owner, is a most natural restriction in the leasing or letting of any property. One extreme drinking party might result in great damage to any ship that was in good condition. Also, due to local con-

ditions affecting the fishing industry, the owner was justified in instructing the captain to avoid Mexican waters and ports. If the boat's mechanical condition was unsatisfactory for a long trip, the owner could restrict the captain to a nearby fishing area. The owner could also request that the captain not hire certain objectionable crew members. These examples are not necessarily consistent with an employer-employee relationship.

Some of the vital differences between the facts in this case and in the Cape Shore case are as follows: In the latter case the union contract required the boatowner (taxpayer) to pay certain minimum wages to the captain and crew whenever an individual's share of the voyage was less than $10.00. If a different crew sailed on the next ship, the expenses of the "broker" were borne by the owner. The same union contract called for the owner to provide "maintenance and cure" to the captain and crew for sickness or injury occurring in service. These owner-provided benefits were not present in the instant case.

Also, in the instant case the captain and crew had to bear the expense of their groceries and one-half of the bill for ice. In addition, the owner-taxpayer here had no control over the operation of the boat. In Cape Shore the owner controlled the time of departure, the duration of the voyage, and the time of return. The working hours of the captain and crew while underway were also regulated by the union contract. None of these elements of control exist in the instant case.

It is difficult to lay down a sharp dividing line. On the other hand, there are some elements that tend to take this case out of the charter boat or independent contractor classification.

The cost of fuel, of repairs to the boat, hull insurance, and protection and indemnity insurance were carried by the boatowner. The owner paid one-half the docking charges whenever the boat docked somewhere other than its home port. The owner-taxpayer had a financial interest in the company that sold fuel and ice to the captain, and the company that purchased the shrimp. He required the captain to deal with these companies. If the captain had to unload his shrimp in another port, the owner still designated the purchaser, and the market price for shrimp in the home port was still used in determining the shares for the captain and crew members.

There are other facts favorable to both the plaintiffs and the defendant, most of which are listed in the majority opinion.

As indicated in the majority opinion, there is no sharp dividing line in these employee-independent contractor cases. Each one must be determined on the facts developed and on the particular set of circumstances.

I feel that the captains of these shrimp boats are very near to being independent contractors. However, in an effort to balance all of the facts present in this case, I have reached the conclusion that the result set out in the majority opinion is the correct one and I therefore concur in that conclusion.

COLLINS, Judge, joins in the foregoing concurring opinion.