Norvell JACKSON, James Jackson and S. F. Jackson, t/a Jackson Seafood Company, Plaintiffs,

v.

Robert L. PHINNEY, District Director of Internal Revenue, Defendant.

L. E. CASTERLINE and Frank Casterline, t/a Casterline Fish Company et al., Plaintiffs,

v.

Robert L. PHINNEY, District Director of Internal Revenue, Defendant.

JOHNSON FISH COMPANY, Inc., Plaintiff,

v.

Robert L. PHINNEY, District Director of Internal Revenue, Defendant.

Civ. A. Nos. 1478–1480.

United States District Court
W. D. Texas,
Austin Division.

April 13, 1967.

Joseph J. Lyman, Washington, D. C., Eli Mayfield, Palacios, Tex., for plaintiffs.

Mitchell Rogovin, Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, D. C., Robert L. Waters, Atty., Tax Div., Dept. of Justice, Fort Worth, Tex., for defendant.

## MEMORANDUM OPINION

ROBERTS, District Judge.

These three cases have been consolidated for decision by the Court on the pleadings, depositions, stipulations, and briefs. Each case is a suit for refund of Federal Insurance Contributions Act (FICA) taxes and Federal Unemployment Tax Act (FUTA) taxes, levied according to 26 U.S.C. Section 3121(d) and 26 U.S.C. Section 3306(i), respectively. The Internal Revenue Service (IRS) alleges that the plaintiffs are employers of certain shrimp captains and deck hands within the meaning of the above acts.

In each case, either as sole proprietors, a partnership, or a corporation, plaintiffs operate and own shrimp boats which fish in the Gulf of Mexico and have a home base in Rockport, Texas. They send out their boats manned by a captain and varying numbers of deck hands. For the period January 1, 1960—December 31, 1962, the plaintiffs paid FICA and FUTA taxes under protest. The plaintiffs in each case claim that the working arrangements that they had with the captain and fishermen were such that the earnings of said people should not have been taxable as regards the plaintiffs under the two acts. Their reasoning is that these workers were not "employees" within the meaning of the acts. In no case is any claim made for the refund of any tax paid by an employee under the acts.

The applicable portions of the statutes read as follows:

26 U.S.C. Section 3121(d): *"Employee.*—For purposes of this chapter, the term 'employee' means—

(1) any officer of a corporation; or

(2) any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee; * * * "

26 U.S.C. Section 3306(i): *"Employee.*—For purposes of this chapter, the term 'employee' includes an officer of a corporation, but such term does not include—

(1) any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an independent contractor, or

(2) any individual (except an officer of a corporation) who is not an employee under such common law rules."

■ In three celebrated 1947 Supreme Court cases, the test of employee status under these statutes was broadened to include all those who as a matter of "economic reality" were employees of a particular taxpayer. But Congress in 1948 specifically spoke out in favor of the old common-law tests in determining the existence of the employer-employee relationship, and it is well settled today that these are the standards to be applied. The problem consists in the application of these standards.

■■ Under the common-law test the generally accepted and fundamental factor involved is whether there exists a "right to control" the activities of the individual, not only as to the results to be attained, but also as to the manner and method of attaining that result. Evidentiary of this common-law right of control are such factors as actual control; integration of the individual's work in the business to which he renders service; the right of the superior to discharge the wage earner; opportunities of the individual for profit and loss; permanency of the relation; skill required of the individual; whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; the method of payment; and whether or not the

parties believe they are creating the relationship of master and servant.

In these cases there is no genuine dispute as to the facts, only as to the effect of the facts under the tests outlined above. From a lengthy stipulation signed by both parties, the following set of facts evolves:

The taxpayers are engaged in the business of commercially fishing for shrimp, and their boats operate primarily from Rockport, Texas. These operate chiefly in the Gulf of Mexico, in and out of docking facilities owned by the taxpayers at Rockport. The boats in question were equipped by the taxpayers and operated solely for shrimp fishing. The boats were diesel trawlers, weighing in excess of ten net tons each, and they were especially equipped by the taxpayers for shrimp fishing, although other fish in small quantities were caught incidentally.

The taxpayer would select a fisherman from a community to whom the boat would be turned over for the purpose of fishing for shrimp. It was understood that the fisherman to whom the boat was turned over would be its captain, and he was so recognized by the taxpayers. The individual so selected was one in whose honesty and integrity the taxpayers had confidence. The taxpayers expected the captain to be able to operate the boat, conduct fishing operations, and select and get along with the crewmen. After an individual was selected as captain, he would take the boat identification papers to the Bureau of Customs and would register with said bureau as captain of the boat as is required by federal law.

The arrangement between the taxpayers and each captain was entirely oral, and the term of the arrangement, was not specified or limited. It could be terminated by either party, voluntarily or involuntarily, although in practice this occurred only at times when a boat was in port. While the arrangement could be terminated in the fashion just described, custom and practice was for it to be continued over an extended period of time for each boat and for more than one trip.

The captains selected the men who would comprise the crew, usually consisting of two in addition to the captain. The captain and crew agreed among themselves upon the crew's compensation without interference by the taxpayers. The captain was in full charge of the boat once the trip commenced and he decided when to start a trip, when to return, where to fish, when to fish once the boat reached the area, how to fish (the actual mechanical process of operating the nets and gear), and all matters pertaining to the operation and fishing of the boat until it returned to the taxpayers' dock.

The taxpayers gave no orders or instruction to the crew with respect to the fishing activities, but they had certain general policies which were known to the captains and crews and which were a part of the arrangement between the taxpayers and each captain. For example, intoxicating liquors were not to be taken aboard the boats, and catch of shrimp was to be brought to the taxpayers' docks, if possible, or where they designated. There was no express agreement specifying the extent to which the taxpayers had control over the fishing activities of the captains. There was in fact no actual control exercised by the taxpayers over the details, manner or methods employed by the captains and their crews. Individual captains were of the view, however, that they were subject to the control of the taxpayers, and this control extended to the right of discharge by the taxpayers.

The taxpayers in No. 1478 divided the catch 60 per cent to themselves and 40 per cent to the captains. This division was of the net proceeds remaining after the cost of heading and processing the shrimp. The taxpayers in No. 1479 paid 50 per cent of the proceeds from the sale of the shrimp to their captains. The taxpayer in No. 1480 paid 50 per cent of the proceeds from the sale of the catch to its captains, and the amount so divided was after the cost of processing.

The cost of processing ranged from 8 to 12 cents per pound of shrimp, but the captain and crew were paid an additional two cents per pound if they headed the shrimp at sea. This two cents is in addition to their 50 per cent share of the proceeds from the sale of the shrimp. In no case was there ever a physical division of the shrimp as between the taxpayers and the captain and crew.

The ordinary rule was that the captain and crew bore the entire expense of all groceries consumed by them during the course of the fishing trip. The captain and crew also paid for their own personal items, such as foul weather clothes, other wearing apparel, and bedding and laundry used by them aboard the boat. The taxpayers paid the cost of the fuel used by the boat. The taxpayers in No. 1478 paid the full cost of all ice used in their shrimping operations, but the captains and crew in Civil Nos. 1479 and 1480 paid for one half of the ice so utilized. The groceries purchased by the captain and crew were charged at stores where the taxpayers had credit, ordinarily being charged to the credit of the particular boat. The amount so charged was deducted against the share of the captain and crew at the time of settlement.

The captains selected the men who would comprise the crew, usually consisting of two besides the captain. Usually the taxpayers did not know who the crewmen would be at the time the arrangement was made with the captain to fish a boat. On occasion, the taxpayer suggested the name of a crewman if the captain requested it, and the crewmen frequently changed from trip to trip. The taxpayers learned the names of the crewmen for each particular trip at the time of the settlement in order to compute for the captain and the crewmen their respective participation in the captain's share of the catch.

After each trip a settlement was made in writing where the taxpayers would provide the captain with a settlement sheet which indicated the gross amount of the proceeds from the sale of shrimp,

without regard to whether the sale had been to the taxpayers or to someone else. The settlement sheet disclosed the charges to the crew as a deduction from the crew's share, and it also disclosed a division of the captain's share between him and the crew in such amounts as they may have agreed upon. The taxpayers did not interfere with the arrangements made between the captains and their crewmen as to division of their share. At the time of each settlement, the taxpayers issued checks to the captains and crew members for the sums due them.

The payment to the crew for each trip depended entirely upon the proceeds of the catch, and there was no guarantee of compensation of any kind regardless of the time or effort expended. If a particular trip was unsuccessful, and the value of the captain's portion of the catch was insufficient to cover the captain's portion of the expenses of the trip, the captain's portion of the expenses would be carried over to succeeding trips to be deducted from the captain's share of subsequent catches. Any unpaid crew expenses as a result of a poor trip were regarded as the personal obligation of the captain. On occasion the taxpayers would make an advance of money to a captain out of their general funds, with the understanding that it was a loan to be repaid, and advances to crewmen were made in the taxpayer's discretion. The captain would charge the amount advanced by the taxpayers against the particular crewman's share, which share had been agreed upon separately between the captain and the crewman. While in port, the captain had to keep the vessel clean and oiled either with the help of the crewmen or with other help provided by him, and neither the captains nor their crewmen were paid for the work thus performed in port except such payment as came out of sharing shrimp caught from the boat.

When a captain brought the catch of shrimp to the home port, it was understood that it would be sold to the taxpayers. The taxpayers guaranteed the

captain a market for the entire catch without loss on account of spoilage, and he was guaranteed the prevailing market price for shrimp in the area when brought to any fishhouse. When a vessel could not readily return to the home port, it would go into a port where it would unload the shrimp at a fishhouse designated by the taxpayers, and such fishhouse would be one with whom the taxpayers had credit arrangements. When the captain would bring a vessel into a port other than the home port, it was understood between the taxpayers and the captain that, before any disposition of the shrimp was made, the captain would call the taxpayer and advise where the vessel was docked and what disposition of the shrimp was desired. Prior to making such a call, the captain would investigate the price to ascertain whether it met the market price. Upon confirmation of that from the captain and verification by the owner of the fishhouse, if satisfied with the price, the taxpayers would authorize the unloading of the shrimp. The buyer of the shrimp would then send the taxpayer a check for the proceeds of the sale.

The taxpayers had no agreement with the captains which would entitle them to a preferred call on all the time and services of a captain. When a captain's action aboard a boat was such as to endanger the lives of the personnel or damage property, the taxpayers would refuse to let him take the boat out again and would sever relations with him. The taxpayers would also sometimes terminate the relationship with a captain who was unable to produce adequate catches of shrimp. Neither the captains nor the crewmen were organized as a labor union in their dealings with the taxpayers. The captains negotiated individually with the taxpayers with respect to the taking of boats. The crewmen made their own arrangements as to pay and expenses of each trip with the captain, and the taxpayers did not interfere with the arrangements between the captains and the crewmen.

Each of the taxpayers in these cases had, at some time prior to the earliest date at issue, filed with the Texas Employment Commission an original Employer's Report of Status. During each of the periods involved in these cases, each taxpayer filed with the Texas Employment Commission an Employer's Quarterly Contribution and Wage Report on which there was shown as "Total wages paid (during this quarter) for employment", an amount which included all of the sums paid to the captain and crewmen involved in these cases. There was also filed by each a federal employment tax return for each year here involved, and each return showed as "taxable wages" all amounts paid to the captains and crewmen involved in these cases.

This case is difficult, as have been others like it recently decided by other courts across the land. In Kirkconnell v. United States, 347 F.2d 260 (Ct.Cl. 1965), and Capital Trawlers, Inc. v. United States, 216 F.Supp. 440 (S.D.Me. 1963), for example, on facts substantially similar to those in this case, the courts found that the captains and deckhands were employees within the acts. On the other hand, in Crawford Packing Co. v. United States, 228 F.Supp. 549 (S.D.Tex.1962), affirmed, 330 F.2d 194 (5th Cir. 1964), and in Star Fish & Oyster Co. v. United States, 223 F.Supp. 402 (S.D.Ala.1963), the courts concluded, also on facts close to this case, that the workers and captains were not employees within the meaning of the two acts. The excellent briefs of counsel point to many other cases, but these suffice to limn the diversity of opinion.

The government at the outset of its brief presses with much force the argument that the common law applicable to these parties should be the centuries-old maritime law, and that under that law, the captain is the agent of the owner (on these facts, anyway) and the crew hands are employees. However, it seems questionable at best whether Congress in reaffirming the use of the common-law tests intended to thereby incorporate maritime law under the FICA and FUTA. Moreover, this argument was

made before the Fifth Circuit Court of Appeals in United States v. Crawford Packing Co., 330 F.2d 194 (1964), and rejected. In this regard, the holding in *Crawford* is much stronger than a mere refusal to say that the trial court's findings of fact were clearly erroneous.

Questions of maritime law aside, the conventional common-law tests of the employer-employee relationship are difficult to apply in this context. The right of control was certainly present to some degree here: the place of unloading the catch, selling it, and even to some extent the buying of supplies were controlled by the owners. The owners of the boats and nets could exercise any owner's control over his property. It may be objected at this point that these are elements of control by the owner or seafood company over his or its end of the business, only—not over the service which these fishermen and captains perform for him. However, in considering the right of control, it is well as the government points out to consider the circumstances under which the work is to be performed. The details of catching, icing, and in some instances heading the shrimp are performed at sea, far from any possible direct supervision of the owners. However, most of the captains questioned thought the owners could tell them what to do, if they so desired. (Henry Carbajal Dep., 11; Will D. Arthur Dep., 8–9) In this connection, it is usually stated that it is the right rather than the actual exercise of control that is important.

Another aspect of the right to control is the right of discharge, which unquestionably existed in these cases. (See, e. g., Juan Pina Dep., 22–23) It is true that since the settlement and hiring arrangements in these cases were on a more-or-less trip-by-trip basis, a discharge could be looked upon as merely a refusal or failure to renew a contract. But since as a practical fact no firing would take place while the boat was at sea, and in view of the continued existence of employment of many of these men over rather long periods of time, the Court feels that the right of discharge here is substantially the same as the more conventional one.

The integration of the work performed by these captains and crewmen into the total business carried on by the owners could hardly be more complete; one can neither pack, process, nor sell shrimp without the shrimp. Also, the captain and crew here certainly participated financially in direct proportion to the gain or loss of the business as a whole. As such, they have a kind of entrepreneurial or proprietary interest in the particular job they perform. This is analogous to cases involving taxicab drivers, where the drivers rent the cabs from the company-owner for a fixed rate per day, and keep all the receipts. See, for example, New Deal Cab Co. v. Fahs, 174 F.2d 318 (5th Cir. 1949), where it was held the drivers were not employees for FICA and FUTA purposes. It is also similar to sharecropping, at least some varieties. In this connection, it is interesting that at the time the tax liability in question here was incurred, Treas.Reg. § 31.3121(d)–1 stated in part:

> If an individual enters into an agreement with another person pursuant to which such individual undertakes to produce a crop or livestock on land owned or leased by such person and pursuant to which (i) the crop or livestock produced by such individual or the proceeds thereof are to be divided between such individual and such other person, and (ii) the amount of such individual's share depends on the amount of the crop or livestock produced, such individual is, with respect to such undertaking, an independent contractor and not an employee.

This portion of the regulation was deleted in an amendment in 1964, and may have been intended to be confined only to the rather narrow fact situation to which it addresses itself. But, just by analogy, the arrangement here with the crew and captains looks very much like a sharecropping arrangement, even though no actual physical division of the catch ever took place, because the regu-

lation says "or the proceeds thereof * * *." It must be admitted that this factor, taken by itself at least, weighs in favor of the independent contractor view.

Despite the apparent ease with which either the owners or the captains and crewmen could have backed out of this arrangement after any given trip, the facts seem to be that relations were fairly permanent, at least as much so as in more conventional cases of employment, where turnovers in personnel are sometimes quite high. As for who supplies the tools and place of work, here the owners supplied the boats and nets with which the shrimp were caught. It is true that the captains and crews invested their labor and skill in fishing, but no more so perhaps than in many other forms of employment which are clearly within the federal acts.

The division of proceeds that occurred in these cases is certainly not "wages" in the ordinary sense. However, it is the long-standing practice of the fishing industry, and it has not been demonstrated how this variance in any way reflects upon the existence of a real employer-employee relationship for purposes of these acts, if such relationship otherwise be found to exist.

The final factor, generally considered to be of greater validity in close cases such as these, is the view the parties held *inter se* of their arrangement. The testimony of the captains has already been referred to above. In addition, there is the fact that the owners, over and above the federal employment tax returns they filed in the past, regularly filed Texas employment tax returns. True it is that the statute and jurisdiction are different, but, as the government points out, the standard of liability under the two statutes is the same, to wit: would the wage-earners be considered employees under the common-law tests. It seems most probable to this Court that the parties looked upon themselves as employer and employee during the periods here in question—at least before these suits were filed.

Looking at the total situation, based on the factors discussed above, it is the opinion of this Court that the plaintiffs were the employers of the captains and deckhands during the taxable periods at issue, and that they are not entitled to recover the FICA and FUTA taxes paid.