Edward A. BARRETT, Plaintiff,

v.

Robert L. PHINNEY, District Director of
Internal Revenue, Defendant,

and

United States of America, Intervenor.

Civ. A. No. 66-G-44.

United States District Court
S. D. Texas,
Galveston Division.

Jan. 8, 1968.

Robert I. White, Chamberlain & Hrdlicka, Houston, Tex., for plaintiff.

Leonard B. Tatar, Tax Division, Dept. of Justice, Fort Worth, Tex., for defendant and intervenor.

## MEMORANDUM AND ORDER

NOEL, District Judge.

This is a suit for the refund of taxes paid in the amount of $1,729.16, alleged to have been erroneously assessed pursuant to the Federal Insurance Contributions Act (FICA), 26 U.S.C. § 3121, the Federal Unemployment Tax Act (FUTA), 26 U.S.C. § 3306, and the collection of income tax at the source on wages (withholding tax), 26 U.S.C. § 3401 et seq. The United States filed a complaint in intervention demanding judgment against the plaintiff for $72,-370.88 assessed by the District Director of Internal Revenue for withholding taxes, FICA and FUTA taxes which have not been paid by the plaintiff and for additions to taxes and penalties assessed for underpayment of taxes due to fraud, 26 U.S.C. § 6653(b), for failure to furnish correct W-2 tax forms, 26 U.S.C. section 6674, and for failure to make timely deposits of employment taxes, 26 U.S.C. § 6656. The United States filed a tax lien against plaintiff for the amounts alleged to be due in its complaint in intervention. The taxable periods in controversy are the quarters and years beginning January 1, 1961, and ending December 31, 1963.

The FICA and FUTA taxes here involved are measured by "wages" paid by an employer to an employee. Thus, the primary issue in this case is whether the captains and deckhands who operated shrimp boats owned by the plaintiff and to whom plaintiff made payments during the taxable periods in question were employees of Barrett within the meaning of 26 U.S.C. § 3121(d) and 26 U.S.C. § 3306 (i). If under the circumstances of this case the fishermen (captains and deckhands) were employees of Barrett, he is admittedly liable for social security and unemployment taxes for 1961–1963 which plaintiff did not withhold or remit.

The facts of this case are almost identical to those developed before this court in Crawford Packing Co. v. United States, 228 F.Supp. 549 (S.D.Tex.1962), aff'd, 330 F.2d 194 (5th Cir. 1964). In fact, prior to 1961 Barrett, the plaintiff, was employed by Crawford Packing Company ("Crawford") as marine superintendent. Furthermore, plaintiff's four shrimp boats had previously been operated by Crawford, he used substantially the same personnel employed by Crawford and patterned his business after that with which he was so familiar as an employee of Crawford. There are, as will be seen, important differences between the Crawford and Barrett operations.

Barrett entered the shrimping business in 1961 after Crawford terminated its business, and plaintiff operated his business during the years 1961, 1962 and 1963, the years in controversy. He lives in Palacios, Texas and operates his business out of Palacios.

Plaintiff owns four shrimping trawlers: the Kathy Ann, Verna Sue, Lynda Sue and Harriett. Each vessel cost between $17,000 and $45,000. Two of the trawlers, the Lynda Sue and Verna Sue,

had been purchased by Barrett while he was working for Crawford and were operated by Crawford under a profit-sharing arrangement with plaintiff. The other two trawlers, the Kathy Ann and Harriett, were purchased from owners who had been chartering the boats to Crawford. All four vessels had been used as shrimp trawlers prior to 1961; they were specially equipped, owned and operated solely for shrimp fishing in the Gulf of Mexico.

Barrett also leased the vacated shore facilities of Crawford. He used those facilities for repairing the machinery and hulls of small fishing boats, for painting boats and for the repair of nets. Personnel were engaged by him on shore for these purposes. Unlike Crawford, plaintiff did not sell fuel, manufacture or sell ice, or purchase, process, pack or prepare and sell fish and shrimp. The issues for present decision concern only Barrett's business of providing his shrimp trawlers to fishermen for their use solely in catching shrimp and the sale of such shrimp to others.

The boats were not operated directly by Barrett, who knew little about catching shrimp. Each boat was operated by a captain to whom it was let and a crew enlisted by him; and, as stated previously, initially the boats were operated and manned by substantially the same people employed by Crawford for the same work. On a few occasions during the years in controversy, however, one of the plaintiff's boats would become "open" and require the selection of a captain for the vessel to whom it would be let. It was understood that the fisherman to whom a boat was let would be its captain, and he was so recognized by plaintiff.

All individuals serving as captains were persons in whose honesty and integrity plaintiff had confidence, and in whom plaintiff had confidence (a) to select a crew (deckhands), (b) to operate the boat, (c) to conduct successful fishing operations and (d) to supervise and get along with the deckhands or crewmen.

The arrangement between plaintiff and each captain was entirely oral. The term of the arrangement was not specified or limited. It could be terminated by either party voluntarily or involuntarily, although in practice this occurred only one or two times during the three years here involved, and that was when a boat was in port.[1] While the arrangement could be terminated, custom and practice was for it to be continued over an extended period of time and for more than one trip. Although it was not formalized by the parties and designated as such, the arrangement constituted an oral contract pursuant to which the captains used the boats belonging to plaintiff under the terms and conditions and pursuant to the policies outlined in this Memorandum.

After an individual was selected as captain, the arrangement between plaintiff and the captain was concluded and the plaintiff surrendered complete possession, the entire command and complete control over the navigaton of the vessel to the captain. The captain would take the boat identification papers to the Bureau of Customs and would register with said bureau as captain of the boat as required by federal law.

Each captain determined the qualifications of and selected his deckhands (that is his crewmen, consisting usually of two besides himself), determined the hours and workng conditions of the crew, and determined how and how much they were to be paid. Plaintiff did not instruct nor attempt to instruct any of the persons manning his vessels how or in what manner to accomplish the catching of shrimp, and had no right to do so under the agreement. Each captain had full charge of his crew and determined (a) when to depart on a fishing trip, (b) when to return, (c) where to fish (that is which fishing ground to work), (d) when to fish, (e) how to fish (that

---

1. Plaintiff had the power to take a boat away from a captain who was unsuccessful in the endeavor; however, plaintiff's captains usually stayed on his boats until they either found a large trawler to work or purchased their own boat.

is actual, mechanical process of operating the fishing nets and gear) and (f) all other matters concerning the operation, maintenance and fishing of the boat from the time of departure from plaintiff's dock until return of the boat from a particular trip. The foregoing were the exclusive prerogatives of the captain. The deckhands took their orders from the captain, exclusively.

Plaintiff had no role in the selection of deckhands, and the captains frequently changed deckhands from trip to trip. Plaintiff learned the names of deckhands for each trip at the time of settlement in order to compute the amount to be paid the captain and each of the deckhands. Barrett had no general policies with respect to the operations of the vessels. The various captains, for reasons of their own safety and efficiency of operation, generally precluded the bringing of intoxicating liquors on board, except for medical reasons.

The captains themselves decided in each instance what port to return to and where to sell their catch; it was in their own best interest to sell the catch at the highest price. Plaintiff furnished the boats with radios, which were used by the captains to call other fishermen and determine where to shrimp (fish) and where the highest price was being paid for shrimp.[2] Thus, generally the catches were sold at the place and in the port where buyers were paying the highest price for shrimp.

Plaintiff, in accordance with the arrangements he had with the various captains, looked only to the captains for the result—the catching of shrimp. Under the agreement, as interpreted by the parties and indicated by the method of operation, plaintiff did not have the right and did not exercise the right to control the manner and means of accomplishing the result. Plaintiff had no agreement with the captains which entitled him to a preferred call on all of the time and services of the captain. He had no actual control over the crewmen nor did he exercise any control over their activities through the captain.

Barrett equipped the boats with nets, shovels, rope and other equipment necessary to shrimp fishing. The captain and crew furnished their own clothing, sleeping gear, and eating utensils.

Under the arrangement between Barrett and each captain, the captain used, worked or fished his boat on the lay or share basis consistent with the long standing custom in the fishing industry, obtaining at least since the time of Christ. There were two types of arrangements, optional with each captain. One method was to allocate $5.00 of each 100 pounds of shrimp caught between the captain and Barrett, $4.00 to Barrett and $1.00 to the captain, with the remaining proceeds to be split equally between them. From the one-half of the proceeds received by the captain, he had to pay expenses consisting of the crew, the food consumed, one-half the ice used on the trip, and a part of the insurance carried on the boat. As a matter of convenience, these amounts were paid by plaintiff and deducted from the amounts paid to the captain and crew. The alternative method was to allocate sixty percent of the sale proceeds to Barrett and forty percent to the captain. Expenses under the second method were handled the same as under the first method. In practice, the captains of the Lynda Sue and Verna Sue operated under the first method, and the captains of the Kathy Ann and Harriett operated under the alternative method. Both sharing arrangements were based upon the price received for shrimp. Barrett did not share in the fish caught or objects dredged from the water incidental to shrimp fishing; All such objects belonged to the captain. The captains themselves made arrangements with the crew as to the method and amount of the crew's compensation.

2. Rarely did a captain or a member of the crew use the radio to contact anyone on shore; this was done only in the event of a personal emergency and was accomplished through the marine operator in Galveston. Barrett had no radio on shore and did not contact a captain or member of a crew except for an emergency.

The price upon which the sharing was based under either plan was the price a fish house was willing to pay for shrimp before the shrimp were headed. The captain and the crew had the option of heading the shrimp, and most of the time they would elect to head the shrimp during the trip. If the shrimp were headed prior to sale, the fish house would pay a higher price. The differential in money received by the captain as a result of heading was retained or paid to him as his profit to share with the crew under whatever agreement the captain and crew had made. Barrett neither knew nor cared to know if the shrimp were headed prior to sale and received none of the proceeds attributed to heading. Beside receiving more money for the headed shrimp, heading served two purposes beneficial to both parties:

(1) it would reduce the weight of the shrimp and thereby permit a larger catch to be brought in, and,

(2) it would help prevent the shrimp from spoiling, thus permitting a longer trip and insuring a fresher product.

The captain decided how much fuel, ice and groceries to take aboard his vessel for the trip. He had the right to purchase these items at any place of his selection. The captains sometimes paid cash for the groceries, but most of the time they would charge them to the captain or crew and the name of the boat, and the bill would be sent to the plaintiff. At the time of settlement for the trip, the amount charged against the boat and paid by plaintiff for groceries was deducted from the captain's share along with one-half the cost of the ice.

Each trip was considered a separate transaction for purposes of settlement, as evidenced by a settlement sheet prepared for each trip. The proceeds received by the captain and crew for each trip depended entirely upon the proceeds from the sale of the catch. The length of any given trip depended on various factors, such as the capacity of the boat, the fuel and ice supply, the weather and the general shrimping conditions, but would ordinarily extend from five to fourteen days. There was no guarantee of any kind of compensation to the captain, regardless of the time or effort expended, for attempting to catch shrimp. He was paid only for shrimp caught, including his differential for heading, plus incidental payments he might receive for other fish. The livelihood of a captain depended solely upon his initiative and skill as a fisherman coupled with the probables of weather and the run of the shrimp. He may have exerted his efforts for long or short periods of time and have no claim to earnings or compensation of any kind, while, on the other hand, he may have been well rewarded by a share of large catch made in a short space of time. If a particular trip was unsuccessful, known in the shrimping trade as a "broker," and the value of a captain's portion of the catch was insufficient to cover the captain's portion of the expenses of the trip, the captain's portion of the expenses would be carried over to succeeding trips to be deducted from the captain's share of proceeds from the sale of subsequent catches. The unpaid expenses were regarded as a personal obligation of the captain by each party to the contract.

The captain was responsibile for making minor repairs to the nets and fishing gear of the boat and for keeping the boat clean. While the boat was in port, the captain was expected to discharge these responsibilities either by employing his deckhands or others hired by him. Neither the captains nor their helpers received any additional payment from the plaintiff for performing this work. Barrett, however, would furnish any materials or parts necessary to make the minor repairs. If major repairs were required, the captain was expected to obtain Barrett's consent before hiring someone else to do the work, and, in any event, Barrett was responsible for the labor and materials used to make major repairs.

After each trip a settlement was made wherein the plaintiff would provide the captain with a settlement sheet which

indicated the gross amount of the proceeds from the sale of the shrimp. Any amounts charged by the captain for groceries and other personal items, as well as one-half of the cost of the ice, were shown as a deduction from the captain's and crew's share. The settlement sheet further disclosed the division of the captain's share between him and the crew (that is, between the captain and his deckhands) in such amounts as they had agreed. Barrett took no part in the arrangements made between the captains and their deckhands as to the division of their share. At the time of settlements, plaintiff would simply issue checks to the captains and to the members of the crew for whatever sums the captain would tell him were due to them out of his share. The only other things of value received by the captains and deckhands from Barrett were turkeys as Christmas gifts and occasionally, if business had been good, a cash bonus was given the captains.

On occasion, the plaintiff would make an advance of funds to the captain with the understanding that it was a loan to be repaid. These loans were usually repaid out of the captain's share from future catches. Advances to deckhands were occasionally made by Barrett, but only with the permission of the boat captain who was personally charged with repayment. The captain would in turn charge the amount advanced against the deckhand's share of the catch.

■ In determining whether the captains and deckhands who operated plaintiff's boats were his employees, the definitions of "employee" given in 26 U.S.C. §§ 3121(d), 3306(i) and 3401(c) are to be employed. Section 3121(d) defines "employee" for purposes of that chapter to mean: "(1) any officer of a corporation; or (2) any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee * * *." Section 3306(i) defines "em-

ployee" for purposes of that chapter to include "an officer of a corporation, but such term does not include—(1) any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an independent contractor, or (2) any individual (except an officer of a corporation) who is not an employee under such common law rules." Section 3401(c) states: "For purposes of this chapter, the term 'employee' includes an officer, employee, or elected official of the United States, a State, Territory, or any political subdivision thereof, or the District of Columbia, or any agency or instrumentality of any one or more of the foregoing. The term 'employee' also includes an officer of a corporation."

It is the contention of plaintiff that the captains of his shrimp boats were independent contractors and not his employees, and that the deckhands were not his employees. Plaintiff relies primarily upon this court's decision in Crawford Packing Co. v. United States, supra, where I found the captains and deckhands of the shrimp boats not to be employees of Crawford. Intervenor argues that under the common law, as applied within the framework of the general maritime law, the captains and deckhands were employees of Barrett.[3] The Government's argument that a maritime-oriented definition of "employee" should be used in this case was not presented to this court in the *Crawford* case, although it was argued in the Government's brief filed with the Court of Appeals for the Fifth Circuit in *Crawford*.

In determining the relationship between Barrett and the captains and deckhands, the common-law definition of employee will be used. This is the test applied in the *Crawford* case by this court, and, after hearing the Government's argument in favor of a maritime-oriented definition, the one used by the Fifth

---

**3.** Under the Government's theory, the captains would not be independent contractors unless they operated the boats under a demise charter with the taxpayer—anything less and they would be employees.

Circuit. See United States v. Crawford Packing Co., 330 F.2d 194, 195, 196.[4] The applicable sections of the Internal Revenue Code make no distinction between an employee for purposes of a tax case involving maritime personnel and any other type of employee, and it must be assumed that no distinction was intended.[5]

 Various guidelines have been developed by the courts for use in determining whether a particular relationship is that of employer-employee within the meaning of 26 U.S.C. §§ 3121(d) and 3306(i) and, for our purpose, § 3401. Relevant factors are: degree of control, opportunity for profit or loss, investment in facilities, permanency of relationship and length of employment, degree of skill required for the work and amount of skill involved in the work, method of payment, and how the parties themselves view their relationship. United States v. Silk, 331 U.S. 704, 716, 67 S. Ct. 1463, 91 L.Ed. 1757 (1947); Kirkconnell v. United States, 171 Ct.Cl. 43, 347 F.2d 260, 265 (1965). While no one factor is controlling and the entire circumstances must be viewed in determining if a person is an employee, the single most important factor is the degree of control exercised by the taxpayer. The *right*[6] to control is the test, and it may be defined as the right to control the persons performing the services, not only as to the result sought to be accomplished, but also as to the details and means by which the result is achieved, i. e. not only control as to what is to be done, but also as to how and when it is to be done. Lifetime Siding Inc. v. United States, 359 F.2d 657, 660 (2d Cir.), cert. denied, 385 U.S. 921, 87 S.Ct. 233, 17 L.Ed.2d 144 (1966). See also Treas.Reg. §§ 31.-3121(d)–1(c) (2), 31.3306(i)–1(b) and 31.3401(c)–1(b).

A case such as this one turns upon its own particular facts. Thus, an exhaustive recitation of the applicable precedent is not necessary. I find that this case is controlled by the *Crawford* case.[7] There are, as was noted initially, important factual distinctions between the facts of the case at hand and those presented in *Crawford;* however, where the differences exist, they weigh in the favor of Barrett and against the position maintained by the Government. In fact, Barrett patterned his operation after Crawford's and relied upon this court's decision in *Crawford* in forming the belief that the captain and deckhands were independent contractors and not his employees. Specifically, I find that the facts presented in the record demonstrate that Barrett did not exercise the degree of control over the captains and deckhands sufficient to make them his employees within the meaning of 26 U.S. C. §§ 3121(d), 3306(i) and 3401(c). Taxes collected by the United States under said sections were erroneously assessed.

 Plaintiff is entitled to a refund of the taxes he demands in his complaint, but the Government is entitled to a setoff to the extent that plaintiff is liable to

---

4. See also Jackson v. Phinney, 266 F.Supp. 835, 839 (W.D.Tex.1967).

5. Subsequent to the *Crawford* decision, Congress amended parts of sections 3121 and 3306, and the definitions of "employee" remain intact—lending weight to common-law definition of employee. Compare Helvering, Commissioner v. Reynolds, 313 U.S. 428, 432, 61 S.Ct. 971, 85 L.Ed. 1438 (1941); Sherman v. Hamilton, 295 F.2d 516 (1st Cir. 1961), cert. denied, 369 U.S. 820, 82 S.Ct. 827, 7 L. Ed.2d 785 (1962).

6. The *use* of the right to control, however, is important in understanding the nature of the relationship between the parties.

7. The Government relies upon Jackson v. Phinney, 226 F.Supp. 835 (W.D.Tex. 1967), where the fishermen were found to be employees of Jackson. In *Jackson,* the court was seemingly persuaded by the fact that the owner of the shrimp boats had filed an Employer's Report of Status and an Employer's Quarterly Report periodically with the Texas Employment Commission and had filed a Texas employment tax return. This, the court reasoned, was evidence that the parties themselves believed theirs to be an employer-employee relationship. No such evidence was offered in this case. This case has other major factual distinctions from *Jackson.*

the Government for payroll taxes respecting the shore-based personnel, as heretofore stipulated. Whatever payments plaintiff has already made to the Government on assessments here involved should be taken into account in making the setoff.

A minor issue in this case has to do with whether two of the persons who worked in the boatyard and machine shop (shore facilities), Arnalfo Villarreal and James C. Scott, filed their own income and self-employment tax returns for 1962 and on such returns paid income and self-employment taxes on the amounts it was agreed they received from Barrett, $1,782.23 and $4,126.66, respectively.[8] Villarreal did file such a return and on the face of such return reported $1,093.55 as wages from plaintiff and paid income taxes on this amount. Scott filed his 1962 income and self-employment tax returns and reported $4,126.66, the amount stipulated as received from the plaintiff, and paid income and self-employment taxes on this amount.

With respect to such persons who worked in plaintiff's machine shop and boatyard and other shore-based personnel, plaintiff is indebted to the Government for a maximum amount of $6,130.-82 for withholding taxes, FICA and FUTA taxes for the quarters and years beginning January 1, 1961 and ending December 31, 1963. This amount is to be reduced by the amount of payroll taxes assessed against the plaintiff to the extent such taxes were paid by Villarreal and Scott. Plaintiff is further entitled to credits against such amount for the payroll taxes he paid for the quarters and years 1961 through 1963.

On this day I have entered an Order Directing Entry of Final Judgment on the issues included in this Memorandum and Order pursuant to rule 54(b) of the Federal Rules of Civil Procedure.[9]

Whether intervenor has preserved the additions to taxes and penalty issues has become a matter of controversy. It is in the interest of the administration of justice that the Order has been entered, and there is no just reason for the delay of judgment in the issues disposed of in this Memorandum and Order. The additions to taxes and penalty issues will be determined at a later date; however, should this decision be appealed and I am affirmed, it would appear that the remaining issues, at least as to the captains and deckhands, would become moot.

Counsel shall prepare and submit a decree in conformity with this Memorandum and Order.

The Clerk shall file this Memorandum and Order and furnish copies to all counsel of record.

## ORDER DIRECTING ENTRY OF FINAL JUDGMENT

Plaintiff has filed a complaint seeking the refund of taxes which he contends were erroneously assessed and paid. The United States filed a Complaint in Intervention alleging that plaintiff owes intervenor certain additions to taxes and penalties. The Pre-trial Order agreed to by the parties and submitted to the court, however, is silent with respect to the additions to taxes and penalty issues.

One of the court's instructions to the parties as to the preparation of the Pre-trial Order was:

Counsel for each party will furnish his adversary a statement of the issues of fact which he will offer evidence to support, eliminating any issues about which there is no real dispute; and including in such statement what counsel conceives to be the issues of law as well as the ultimate issues of fact.

\* \* \* \* \* \*

---

8. Plaintiff has stipulated that for purposes of this case Villarreal and Scott were his "employees" during 1962.

9. See Cold Metal Process Co. v. United Engineering & Foundry Co., 351 U.S. 445,

76 S.Ct. 904, 100 L.Ed. 1311 (1956); DeNubilo v. United States, 343 F.2d 455 (2d Cir. 1965); Wisconsin Liquor Co. v. Park & Tilford Distillers Corp., 267 F.2d 928 (7th Cir. 1959).

The order will set forth:

 \* \* \* \* \* \*

(3) A concise summary of the ultimate facts claimed \* \* \*;

(5) Contested issues of fact;

(6) Contested issues of law \* \* \*.

■ The United States, as any other party, is bound to the limits of its claim as stated in the Pre-trial Order, and may be relieved therefrom only by a showing of manifest injustice. United States v. Fallbrook Public Utility District, 165 F.Supp. 806, 822 (S.D.Cal.1958). Thus, once issues are settled in a pre-trial order, the case shall go to trial on those issues, and they control the subsequent course of the action—unless modified by the judge in the exercise of his discretion upon a showing of manifest injustice. See Case v. Abrams, 352 F.2d 193 (10th Cir. 1965); Olson v. Shinnihon Kisen K.K., 25 F.R.D. 7 (E.D.Pa. 1960).

Prior to a determination of the merit of the additions to taxes and penalty issues, I must first decide whether there would be manifest injustice in denying intervenor's request to amend the Pre-trial Order to incorporate these issues. In addition, if I were to allow intervenor to amend the Pre-trial Order for this purpose, it would probably become necessary to hear additional evidence on these issues. If, on the other hand, the decision on the remaining issues, which I find to constitute a separate claim under rule 54(b) of the Federal Rules of Civil Procedure, is appealed and I am affirmed, the additions to taxes and penalty issues, at least as to the captains and deckhands, would appear then to become moot.

Pursuant to rule 54(b), the court expressly determines that there is no just reason for delay in entering final judgment as to the plaintiff's claim for refund, and I hereby direct the entry of final judgment on said claim. All other issues which have not been disposed of in the Memorandum and Order entered this day are retained on the docket for later disposition.