UNITED STATES *v.* W. M. WEBB, INC., ET AL.

No. 63.   Argued November 17, 1969—Decided March 3, 1970

*Solicitor General Griswold* argued the cause for the United States.   With him on the briefs were *Assistant Attorney General Walters, Harris Weinstein, Matthew J. Zinn, Louis M. Kauder,* and *Robert I. Waxman.*

*Joseph J. Lyman* argued the cause and filed a brief for respondents.

Mr. Justice Harlan delivered the opinion of the Court.

The respondents in this case, which was consolidated below, own boats that are used in commercial fishing in the Atlantic Ocean and the Gulf of Mexico. Their fishing is carried out through contractual arrangements, shaped by established custom, with boat captains, who man the boats and manage their day-to-day operation. The question before the Court is whether the captains and crewmen of the boats are the "employees" of the respondents within the provisions of the Federal Insurance Contributions Act (FICA) [1] and the Federal Unemployment Tax Act (FUTA),[2] which impose taxes on employers to finance government benefits for employees.

## I

During the taxable periods involved here,[3] the respondents' vessels were engaged in fishing for menhaden, a nonedible fish that is processed and used for various industrial purposes. The owner of each vessel equipped the vessel and secured the services of an experienced fisherman to be captain. The captain then assembled a crew. The captain customarily served on the same vessel for a full season, and occasionally for several consecutive seasons, although the oral arrangements between owners and captains permitted either to terminate the relationship at the end of any fishing trip. The fishing trips lasted from one to several days.

---

[1] 26 U. S. C. § 3101 et seq.

[2] 26 U. S. C. § 3301 et seq.

[3] The District Court found that the periods were, for different respondents, January 1, 1956, through December 31, 1956, and July 1, 1957, through December 1, 1958.

The vessels were operated from docking facilities owned by fish-processing plants, and discharged their catch at these plants upon the completion of each trip. The plants paid respondents for the fish according to the volume of the catch, and respondents paid the captains and crews on the same basis, following terms that had been negotiated in advance. Neither captains nor crews were guaranteed any earnings if they failed to catch fish. While respondents determined the plant to which the vessels would report and generally where and when the fishing would take place, the captains managed the details of the operation of the boats and the manner of fishing.

Respondents filed tax returns as employers under the FICA and the FUTA, and paid the employer's share of the taxes due on the earnings of the captains and crews. After making the appropriate claims for refunds, they sued for refunds in the District Court for the Eastern District of Louisiana. The District Court, sitting without a jury, determined after trial that the captains and crews were not respondents' employees for the purposes of these tax statutes. The trial court noted that both the FICA and the FUTA define "employee" as any individual who has employee status under "the usual common law rules" applicable to a determination of the master-servant relationship. It found "without merit" the Government's contention "that the common-law governing the relationship of the taxpayer and the fishermen in pursuing fishing ventures in the Gulf of Mexico and the Atlantic Ocean is the general maritime law." 271 F. Supp. 249, 257 (1967). The court found further that the degree of control exercised by respondents over these fishing activities was not sufficient, under the common-law standards governing land-based occupa-

tions, to create the relationship of employer and employee between respondents and the captains and crews. Respondents were thus held entitled to their refunds.

On appeal, the Court of Appeals for the Fifth Circuit affirmed. It reviewed the facts and observed that "it is clear that under maritime law the captain is the agent of the owner . . . and the crew hands are employees," and that "[i]f we were free to apply maritime law as a test of the employer-employee relationship, we would reverse the decision of the district court." 402 F. 2d 956, 959 (1968).[4] However, the Court of Appeals agreed with the District Court that the statutes' prescription of "common law rules" barred application of maritime standards.

This conclusion conflicts with the approach of the Court of Claims in *Cape Shore Fish Co.* v. *United States,* 165 Ct. Cl. 630, 330 F. 2d 961 (1964). In that decision the court found scallop fishermen, operating under arrangements similar to those here, to be employees of the shipowner for the purposes of these statutes. It reached this conclusion by applying to the facts the standards of maritime law. We granted certiorari in this case, 394 U. S. 996 (1969), to resolve this conflict, and to clarify the application to maritime workers of these important federal statutes.

## II

The parties agree that both the FICA and the FUTA impose taxes on employers measured by the compensation paid to employees, and that in terms of this case the two statutes define "employee" identically. In the FICA "employee" is defined to include "any individual

---

[4] We are not called upon to, and do not, intimate any view on the correctness of the Court of Appeals' statement on this score.

who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee," and the language of the FUTA is to the same effect.[5] These definitions were not included in the original Social Security Act as it was adopted in 1935, which defined "employee" merely by specifying that it "includes an officer of a corporation,"[6] but were added by amendment in 1948. We must consider the events that prompted the amendment.

In 1935 the draftsmen of the Social Security Act apparently thought it unnecessary to elucidate the meaning of "employee" because they assumed that the term, as it was applied to varying factual situations, would be given the "usual" meaning it bore at common law. See S. Rep. No. 1255, 80th Cong., 2d Sess., 3–4 (1948). However, over the years of applying the Act to a myriad of work relationships, the lower federal courts developed

---

[5] The definitions provide:

"For purposes of [the FICA], the term 'employee' means— (1) any officer of a corporation; or (2) any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee; or (3) [any member of several specific occupations, not including fishing, when certain conditions are satisfied]." 26 U. S. C. § 3121 (d).

"For purposes of [the FUTA], the term 'employee' includes an officer of a corporation, but such term does not include—(1) any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an independent contractor, or (2) any individual (except an officer of a corporation) who is not an employee under such common law rules." 26 U. S. C. § 3306 (i).

[6] Social Security Act § 1101 (a) (6), 49 Stat. 647. The language of § 1101 (a) (6) was carried over to §§ 1426 (c) and 1607 (h) of the Internal Revenue Code of 1939, the predecessors of present §§ 3121 (d) and 3306 (i) of Title 26, respectively. See 53 Stat. 178, 188.

somewhat varying approaches, certain courts relying more heavily on common-law precedents and others attempting to discern a special meaning for the term from the purposes of the legislation.[7]   In addition, the courts tended to look to local precedents to determine the common-law standards, producing different results for similar factual situations in various parts of the country.[8]   This divergence of views led this Court, in 1947, to render two decisions in an attempt to clarify the governing standards.   *United States* v. *Silk,* 331 U. S. 704; *Bartels* v. *Birmingham,* 332 U. S. 126.

In *Silk,* the Court upheld the lower courts' determination that certain truck drivers were, under the circumstances, independent contractors rather than employees, but it upset a similar ruling with respect to a group of men who unloaded coal from railroad cars.   In *Bartels* the Court, reversing the Court of Appeals, held that the members of certain dance bands were not employees of the owners of the dance halls at which they were engaged, despite contractual provisions characterizing them as employees.   While the Court's opinions in these cases stressed many of the factors that had been important in common-law determinations of employee status, they also contained language that could be read to detach the ques-

---

[7] Compare, *e. g., Jones* v. *Goodson,* 121 F. 2d 176 (C. A. 10th Cir. 1941); *Radio City Music Hall Corp.* v. *United States,* 135 F. 2d 715 (C. A. 2d Cir. 1943); *United States* v. *Mutual Trucking Co.,* 141 F. 2d 655 (C. A. 6th Cir. 1944); *McGowan* v. *Lazeroff,* 148 F. 2d 512 (C. A. 2d Cir. 1945); *United States* v. *Wholesale Oil Co.,* 154 F. 2d 745 (C. A. 10th Cir. 1946), with *United States* v. *Vogue, Inc.,* 145 F. 2d 609 (C. A. 4th Cir. 1944); *United States* v. *Aberdeen Aerie,* 148 F. 2d 655 (C. A. 9th Cir. 1945); *Grace* v. *Magruder,* 80 U. S. App. D. C. 53, 148 F. 2d 679 (1945).

[8] See S. Rep. No. 1255, *supra,* at 6.

tion of statutory coverage from the common-law tests.[9] The Court stated, in *Bartels,* that "in the application of social legislation employees are those who as a matter of economic reality are dependent upon the business to which they render service." 332 U. S., at 130.

Acting upon this language, the executive agencies set about replacing their original regulation, which had defined the employment relation in terms of the incidents of employment at common law,[10] with a new regulation that would embody the test of "economic reality."[11] However, the proposed new regulation never took effect.

---

[9] In *Silk,* the Court said:

"As the federal social security legislation is an attack on recognized evils in our national economy, a constricted interpretation of the phrasing by the courts would not comport with its purpose. . . .

. . . . .

". . . When [the problem of differentiating between employee and independent contractor] arose in the administration of the National Labor Relations Act, we pointed out that the legal standards to fix responsibility for acts of servants, employees or agents had not been reduced to such certainty that it could be said there was 'some simple, uniform and easily applicable test.' The word 'employee,' we said, was not there used as a word of art, and its content in its context was a federal problem to be construed 'in the light of the mischief to be corrected and the end to be attained.' We concluded that, since that end was the elimination of labor disputes and industrial strife, 'employees' included workers who were such as a matter of economic reality. . . . We rejected the test of the 'technical concepts pertinent to an employer's legal responsibility to third persons for acts of his servants.' . . . *Labor Board* v. *Hearst Publications,* 322 U. S. 111, 120, 123, 124, 128, 129, 131.

"Application of the social security legislation should follow the same rule that we applied to the National Labor Relations Act in the *Hearst* case." 331 U. S., at 712–714.

[10] 1 Fed. Reg., pt. 2, at 1764 (1936), promulgated November 9, 1936 (Treasury Department); 2 Fed. Reg., pt. 1, at 1276 (1937), promulgated July 20, 1937 (Social Security Board).

[11] 12 Fed. Reg. 7966 (1947).

Within two months of its announcement, a resolution was introduced in both the House of Representatives and the Senate calling for "a reassertion of congressional intent regarding the application of the act." S. Rep. No. 1255, *supra,* at 7. This resolution, which was finally passed over the President's veto, added to the statutes the present definitions of "employee." [12]

The report of the Senate Finance Committee on the resolution makes clear a congressional purpose to disapprove the proposed regulation and to reaffirm that determinations of employee status were to be based on the traditional legal tests. The Committee seems to have thought that the *Silk* and *Bartels* decisions had applied traditional common-law standards, despite the language in the opinions suggesting a less constrictive approach. However, noting that the Treasury Department claimed support in those decisions for its contemplated new departure, the Committee declared: "But if it be contended that the Supreme Court has invented new law for determining an 'employee' under the social-security system in these cases, then the purpose of this resolution is to reestablish the usual common-law rules, realistically applied." *Id.,* at 2.

---

[12] H. J. Res. 296, 62 Stat. 438; see H. R. Doc. No. 711, 80th Cong., 2d Sess. (veto message of President Truman). This 1948 amendment put the definitions in both statutes in the negative form now found in 26 U. S. C. § 3306 (i), see n. 5, *supra.* The Social Security Act Amendments of 1950 restyled the predecessor of § 3121 (d), giving it the form now possessed by that provision, without changing the applicable principles except to extend coverage to specified classes of workers irrespective of their common-law status. § 205, 64 Stat. 536; see H. R. Rep. No. 2771, 81st Cong., 2d Sess., 104 (1950); cf. S. Rep. No. 1669, 81st Cong., 2d Sess., 17–18 (1950); H. R. Rep. No. 1300, 81st Cong., 1st Sess., 80–91, 189–207 (1949).

The causes of congressional dissatisfaction with the proposed regulation were twofold. As a fiscal matter, the Committee cited testimony that the new regulation would extend social security benefits to between 500,000 and 750,000 new workers, who had not been covered previously and had not contributed to the trust fund from which benefits would be paid, thus endangering the integrity of the fund. More generally, the Committee was fearful of the uncertainty that would be created by the new regulation, and the discretion it would give to the executive agencies in determining the applicability of the statutes. The report stated:

"In a word, by unbounded and shifting criteria, [the proposed regulation] would confer in those administering the Social Security Act full discretion to include, or to exclude, from the coverage of the act any person whom they might decide to be, or might decide not to be, an 'employee'; and like discretion to fasten tax liabilities and the administrative duties and costs of compliance with the act upon any person whom they might decide to be an 'employer.'

. . . . .

"The *proposed* regulation discards the common-law rules for distinguishing the employer-employee relationship distilled from many decisions by many courts out of many insights of real situations, for a new rule of nebulous character.

"Under the *proposed* regulation an 'employee' is 'an individual in a service relationship who is dependent as a matter of economic reality upon the business to which he renders service and not upon his own business as an independent contractor.'

"The rule, obviously, will not serve to make the necessary distinctions. Who, in this whole world

engaged in any sort of service relationship, is not dependent as a matter of economic reality on some other person? . . .

.    .    .    .    .

"[T]he *proposed* regulation concerns itself mainly, as was stated to your committee by a witness at the hearings: '. . . with making it abundantly clear that on virtually no state of facts may anyone be certain whether or not he has a tax liability until the Commissioner has made up his mind about it.'" *Id.*, at 7, 10, 11.

The Committee stated that, in contrast to the proposed regulation, whose "basic principle . . . is a dimensionless and amorphous abstraction," the existing regulation was "not devoid of uncertainty, but its basis is in established standards of law which frame and limit its application." *Id.*, at 12. The conclusions stated in the House Report were similar. H. R. Rep. No. 1319, 80th Cong., 2d Sess. (1948).[13] By the resolution, Congress unequivocally tied the coverage of these tax provisions to the body of decisional law defining the employer-employee relationship in various occupations.

---

[13] In a report published just two weeks before the enactment of the resolution (commenting on H. R. 6777, a bill that contained the same amendment ultimately accomplished by the resolution), the House Committee on Ways and Means stated:

"Our failure to act may be further construed as conferring upon the administrative agencies and the courts an unbridled license to say, at will, whether an individual is an employee or an independent contractor . . . .

.    .    .    .    .

"[T]he basic, controlling factor is whether the policy of the Congress shall be to cover as employees only those who are employees under the common-law rule, or to cover a broader class of individuals under some nebulous hypothesis with no bounds to its application." H. R. Rep. No. 2168, 80th Cong., 2d Sess., 9 (1948).

In none of the discussions of the 1948 resolution was there any discussion of maritime employees. The respondents argue that, by failing to make specific provision for the application of maritime law to seagoing occupations, Congress impliedly decreed that those occupations should be gauged by the standards of the "common law" applicable to land-based activities. They rely in part on the fact that the phrase "common law" is sometimes used in contradistinction to the "maritime law" traditionally applied in courts of admiralty, and they also point to the fact that the Senate Report stressed the degree of the employer's control over the employee's work as central to the Committee's understanding of the common-law tests of employment. The Senate Report quoted with approval the then-existing regulation, substantially identical to the one now in effect,[14] which stated:

> "Every individual is an employee if the relationship between him and the person for whom he performs services is the legal relationship of employer and employee.
>
> "Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done." S. Rep. No. 1255, *supra*, at 3.

Respondents argue that this language indicates a congressional intent that, where the maritime nature of a

---

[14] 26 CFR § 31.3121 (d)–1–(c).

vocation makes impracticable the degree of control generally exercised by land-based employers over their employees, the land-based standards must nevertheless be applied, with the result that no "employment" exists for the purposes of those statutes.

## III

We do not think Congress intended the anomalous result of having maritime activities subject to standards, for social security tax purposes, other than those that are relevant to seafaring enterprises. Such a result is not necessary to accomplish the dual concerns underlying the 1948 amendment. Application of maritime standards to determine the status of members of fishing ventures will not open brand new areas of social security coverage. To the contrary, the employee status of captains and crewmen engaged in fishing operations similar to these is supported by a Treasury Department interpretation, applying maritime standards, that was issued in 1940, immediately after maritime employees were first brought within the coverage of the Social Security Act by amendment in 1939. S. S. T. 387, 1940–1 Cum. Bull. 192; see Social Security Act Amendments of 1939, §§ 606, 614, 53 Stat. 1383, 1392, as amended, 26 U. S. C. §§ 3121 (b), 3306 (c). This ruling, which the Social Security Administration has accepted for purposes of paying benefits to claimants, had existed for eight years before Congress added the present definitions of "employee" to the statutes. It was not mentioned at the time of the 1948 amendment. Since the ruling represented the accepted view of both the taxing and paying agencies, Congress could have had no concern that payment of benefits to

maritime employees would constitute an uncompensated drain on the social security fund.[15]

More important, the chief concern behind the 1948 amendment—avoiding the uncertainty of the proposed "economic reality" test—is wholly satisfied if seafaring work relationships are tested against the standards of maritime, rather than land-based, decisional law. Congress' fearfulness of the "nebulous" nature of the proposed regulation indicates that it used the phrase "usual common law rules" in a generic sense, to mean the standards developed by the courts through years of adjudication, rather than in a technical sense to mean those standards developed by "common law" courts as opposed to courts of admiralty. Maritime law, the common law of seafaring men, provides an established network of rules and distinctions that are practically suited to the necessities of the sea, just as land-based decisional law provides a body of rules adapted to the various forms of domestic employment. The goal of minimizing uncertainty can be accomplished, in the maritime field, by resort to the "usual" rules of maritime jurisprudence.[16]

---

[15] Subsequent amendments to the social security laws make it now even clearer that classification of some maritime workers as employees will not threaten the social security fund. The Social Security Act Amendments of 1950 extended benefits coverage to the self-employed for the first time. 64 Stat. 502, 540; see H. R. Rep. No. 1300, 81st Cong., 1st Sess., 9–10 (1949). Benefits for the self-employed are financed by taxes paid by them under the Self-Employment Contributions Act, 26 U. S. C. § 1401 et seq.; see H. R. Rep. No. 1300, supra, at 135–145; S. Rep. No. 1669, 81st Cong., 2d Sess., 153–166 (1950). Therefore, the captains and crewmen are eligible for social security benefits whether they are considered employees or self-employed.

[16] A conclusion that maritime standards could not be applied might frustrate Congress' evident expectation that the FICA and

This conclusion is not weakened by the emphasis given, both in the Senate Report and in the regulation, to the factor of control. Control is probably the most important factor under maritime law,[17] just as it is under the tests of land-based employment. It may be true that, in most maritime relationships, the workers enjoy discretion that is unusually broad if measured by land-based standards—a discretion dictated by the seafaring nature of the activity. However, except where there is nearly total relinquishment of control through a bareboat, or demise, charter, the owner may nevertheless be considered, under maritime law, to have sufficient control to be charged with the duties of an employer. See, e. g., *The Norland*, 101 F. 2d 967 (C. A. 9th Cir. 1939); G. Gilmore & C. Black, The Law of Admiralty § 4–23 (1957). Congress' stress on the importance of control reflects the primacy of that factor in the rules governing the most common, land-based vocations,[18] which were certainly foremost in the congressional mind at the time of the

---

FUTA legislation would apply to seamen, and specifically to fishermen. As noted above, the 1939 amendments extended the statutes to cover maritime employees. Additionally, 26 U. S. C. § 3121 (b)(4) provides an exemption for service by aliens on foreign vessels, and § 3306 (c)(17) exempts fishermen on vessels that do not exceed 10 tons in displacement. These provisions raise the inference that fishermen on larger vessels were expected to be covered, under the general "common law rules" provision. However, if shipowners were relieved of the employers' tax liabilities unless their relationship with the captains and crews were of the sort that would constitute an employer-employee relationship in a land-based activity, application of the statutes to fishermen might be seriously limited.

[17] See, e. g., *Cape Shore Fish Co.* v. *United States*, 165 Ct. Cl. 630, 637–641, 330 F. 2d 961, 965–968 (1964); G. Gilmore & C. Black, The Law of Admiralty § 4–21 (1957).

[18] See, e. g., *Radio City Music Hall Corp.* v. *United States*, 135 F. 2d 715, 717–718 (C. A. 2d Cir. 1943).

1948 amendment. It does not preclude the application, in different areas, of decisional rules that vary in the precise degree of control that is required. Cf. *Deecy Products Co.* v. *Welch,* 124 F. 2d 592, 598–599 (C. A. 1st Cir. 1941); *McGuire* v. *United States,* 349 F. 2d 644 (C. A. 9th Cir. 1965).[19]

The guidelines in the regulation also allow for such flexibility, as is attested by the existence, for nearly 30 years, of the Treasury ruling, S. S. T. 387, confirming the employee status of fishermen such as those involved here. Now, as in 1948, the regulation proceeds, after the language already quoted, to elaborate some of the factors other than control that may be important:

> "The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services." 26 CFR § 31.3121 (d)–1 (c)(2).[20]

---

[19] See H. R. Rep. No. 2168, *supra,* n. 13, at 9–10:

"Ample flexibility is possible under [the common-law] rule to accommodate peculiar or unusual employment relationships so frequently found in our complex economic system.

.        .        .        .        .

"The common-law concept of master and servant, of course, is no more fixed and immutable than the common law itself. Hence it will produce in practice varying results under varying circumstances and in different jurisdictions. But such variations will not offend the common-law rule itself. . . .

". . . There is nothing to fear from differences in the application of the common-law tests, but there is much to fear from the abandonment of recognized common-law principles in resolving such questions of fact. Such abandonment would simply amount to reliance upon no recognized body of legal principles."

[20] Other factors that may have significance are discussed in *United States* v. *Silk,* 331 U. S. 704 (1947); *Enochs* v. *Williams Packing Co.,*

It is clear that this brief sketch of relevant factors cannot be intended to provide a workable test, complete in itself, displacing the complex of common-law rules Congress so carefully tried to preserve.   Rather, the regulation provides a summary of the principles of the common law, intended as an initial guide for the determination, required by the first sentence of the regulation, whether a relationship "is the legal relationship of employer and employee."   The thrust of both statute and regulation is that the standards that are to govern in any field are those that the courts customarily apply to define this "legal relationship." [21]

We conclude that the Court of Appeals erred in declining to judge the status of the captains and crewmen against the standards of maritime law.   Accordingly, the judgment is reversed, and the case is remanded to that court for proceedings consistent with this opinion.

*It is so ordered.*

---

370 U. S. 1 (1962); *Kirkconnell* v. *United States,* 171 Ct. Cl. 43, 347 F. 2d 260 (1965); *Illinois Tri-Seal Products, Inc.* v. *United States,* 173 Ct. Cl. 499, 353 F. 2d 216 (1965).

[21] We find no support for a contrary conclusion in the fact that, shortly after the District Court's decision in this case, the Treasury Department unsuccessfully sought an amendment to § 3121 (d)(3) defining "employee" to include the captains and crews of commercial fishing vessels without regard to their status under the general definition in § 3121 (d)(2), see n. 5, *supra.*   See the bill that became the Social Security Amendments of 1967, H. R. 12080, §§ 504 (b)(1), (2) (as amended by the Senate); S. Rep. No. 744, 90th Cong., 1st Sess., 203–205, 320–324 (1967); H. R. Rep. No. 1030, 90th Cong., 1st Sess., 74 (1967) (Conference Report deleting the amendment).   That the Treasury also chose to proceed on the legislative front does not impair the argument put forth by the United States here, and Congress' failure to adopt the amendment is a dubious indication of the position of Congress in 1967 on the question before us, let alone the position of a different Congress in 1948.   Cf. *United States* v. *Price,* 361 U. S. 304, 310–312 (1960); *United States* v. *Wise,* 370 U. S. 405, 411 (1962).