581 F.2d 1098
 CAROLINA SEAFOODS, INC., a corporation, Appellee,
v.
UNITED STATES of America, Appellant.
Thomas P. DUKE, Jr., Thomas P. Duke, III, d/b/a Bulls Bay
Seafood Company, a partnership, Appellees,
v.
UNITED STATES of America, Appellant.
 Nos. 77-1120, 77-1121.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 9, 1978.
Decided Aug. 1, 1978.
 
 Libero Marinelli, Jr., Tax Div., Dept. of Justice, Washington, D. C. (Myron C. Baum, Acting Asst. Atty. Gen., Washington, D. C., Mark W. Buyck, Jr., U. S. Atty., Columbia, S. C., A. Elliott Barrow, Jr., Asst. U. S. Atty., Charleston, S. C., Gilbert E. Andrews and Ann Belanger Durney, Tax Div., Dept. of Justice, Washington, D. C., on brief), for appellant.
 Jim Dunn, Conway, S. C. (Irby E. Walker, Jr., Myrtle Beach, S. C., on brief), for appellees.
 Before BRYAN, Senior Circuit Judge, and WINTER and HALL, Circuit Judges.
 ALBERT V. BRYAN, Senior Circuit Judge:
 
 
 1
 Wholesale oysterhouses in South Carolina were assessed with Federal Insurance Contributions Act taxes, 26 U.S.C. § 3101 Et seq., in 1972 and 1973 upon moneys paid to the pickers of oysters who gathered and brought them to the houses for disposal in their business. The assessments were paid under protest by the taxpayers, Carolina Seafoods, Inc. and Bulls Bay Seafood Company. These moneys were ordered refunded by the District Court in taxpayers' suits contending that the pickers were not employees but were independent contractors.* The United States appeals and we affirm.
 
 
 2
 The oysters are tonged or picked by hand from the State-owned wetlands along the Atlantic coast in areas leased to the oysterhouses by the State. Occasionally South Carolina allows commercial oystermen to take oysters from land which she owns but has not leased to anyone. When and as picked, the oysters are put in a flat bottom boat, commonly called a bateau, outfitted with a small outboard motor for movement from one place to another over the beds. Ordinarily, at the beginning of the day's work one or more of the bateaux are towed from the dock of the oysterhouse onshore to the beds where the pickers will work, and are towed back to the dock at the end of the day for unloading.
 
 
 3
 During the period in suit, each bateau was owned either by an oysterman or by the oysterhouse and leased to him. In either circumstance, the evidence showed the gathering operation was performed by the oystermen in identical fashion, whether the boat was owned by them or leased to them. If they were lessees, they paid for the use of the boats at the rate of 10 cents per bushel of oysters they had gathered with a maximum of $10 per week.
 
 
 4
 The District Court's judgment for the taxpayers determining the non-owner oystermen not to be employees was based on the Internal Revenue Code, 26 U.S.C. § 3121(d), Treasury Regulations, 26 C.F.R. 31.3121(d)-1(c) and the common law prescribing guides for the determination of such status. The Court observed, too, that the United States had conceded that the oystermen bateaux-owners were not employees, and perceiving no difference therefrom in the manner of dealing between the oysterhouses and the non-owner oystermen, the Court felt this concession was the equivalent of an admission to the same effect as to the non-owners. While agreeing with the conclusion of the District Judge based on the law and evidence, and recognizing the force of his inference from the concession, we also rest affirmance upon indisputable facts establishing the relationship in law between the oysterhouse and the non-owner oystermen as one of owner and lessee.
 
 
 5
 Appellant quite soundly asserts that the question of who is an employee must be judged by maritime law. To this point the Government cites United States v. Webb, Inc., 397 U.S. 179, 192, 90 S.Ct. 850, 856, 25 L.Ed.2d 207 (1970). It affirms this premise:
 
 
 6
 "Control is probably the most important factor under maritime law, just as it is under the tests of land-based employment. . . . However, except where there is nearly total relinquishment of control through a bare-boat, or demise, charter, the owner may nevertheless be considered, under maritime law, to have sufficient control to be charged with the duties of an employer." (Accent added and footnote omitted.)
 
 
 7
 This decision compels the conclusion that in law the non-owner oystermen were not employees. The reason is that they operated the boats under a demise investing them with the character of charterers. While in this status, the owner the oysterhouse as a matter of law had no control of the boats whatsoever, for as charterers the oystermen were lessees thereof.
 
 
 8
 Apparently this accounts for the litigating parties' uniform designation of the arrangement between an oysterman and the oysterhouse as a "lease." Although the oysterhouse remained the owner, the oysterman and his co-worker, if any, aboard the bateau had exclusive possession and control of it. The owner could terminate the lease at will, concededly, but so long as it subsisted, he had no control of the oysterman. Such a charter does not require any particular time span; it may be for a day, for a month or for years. The charter is further instantly emphasized by the fact that the non-owner paid daily charter hire in money and he had no lay on the catch.
 
 
 9
 On the score of control G. Gilmore and C. Black, The Law of Admiralty (1957), declared the present relationship in explaining the demise charter:
 
 
 10
 "C. The Demise or Bareboat Charter. In this form, the charterer takes over the ship, lock, stock and barrel, and mans her with his own people. He becomes, in effect, the owner Pro hac vice, just as does the Lessee of a house and lot, to whom the demise charterer is analogous. Obviously, such an arrangement is suitable to the needs of anyone who wants, For a time, to be in the position of the owner of a vessel, but who does not want to go to the expense and trouble of buying one or having one built." At 171.
 
 
 11
 "The demise, in practical effect and in important legal consequence, shifts the possession and control of the vessel from one person to another, just as the shoreside Lease of real property shifts many of the incidents of ownership from lessor to lessee. The owner of a demised ship still has an interest in her, just as the lessor is interested in the house and lot he has leased to somebody else. But the principal interests he has are in receiving the agreed hire and getting the vessel back at the end of the term; . . ." At 215. (Accents added.)
 
 
 12
 Again, 1 Benedict on Admiralty § 225, at 14-28 (7th ed. 1974) states:
 
 
 13
 "In a charter party of the second kind, (the demise charter) not only the entire capacity of the ship is let, but the ship itself, and the possession is passed to the charterer. The Entire control and management of it is given up to him." (Accent added.)
 
 
 14
 That small craft, such as bateaux, are subject to maritime jurisdiction is evident in the holding that a rowboat is within it. Chimene v. Dow, 104 F.Supp. 473 (S.D.Tex.1952). Note, too, the Motorboat Act of 1940, 46 U.S.C. § 526a, classifying motorboats by lengths, including those less than 16 feet. Thus this case comes within the exception made in United States v. Webb, supra, 397 U.S. at 192, 90 S.Ct. 850, as previously noted.
 
 
 15
 The judgment of the District Court granting recovery of the taxes will stand.
 
 
 16
 Affirmed.
 
 WINTER, Circuit Judge, dissenting:
 
 17
 Close attention to the facts in the light of the pertinent applicable law persuades me that the "lessee" oystermen[1] were the taxpayers' employees; and as a consequence, the judgment of the district court granting tax refunds should be reversed. From the majority's contrary conclusion, I respectfully dissent.
 
 
 18
 The appeal presents the question of whether lessees are "employees" of the taxpayers for purposes of liability on the part of the taxpayers for taxes under the Federal Insurance Contributions Act (FICA), 26 U.S.C. §§ 3101 Et seq. The rules of law to be applied are not complex; the case is largely factual.[2] To make the relevance of the facts more obvious, I will defer stating them until I have developed the law. But even before I proceed to a discussion of the law, I am constrained to express my complete disagreement with the method of decision employed by the district court. Were it simply that the district court was wrong in its conclusion, its method of reasoning properly could go unnoticed; but in affirming, the majority states its recognition of the "force" of the inference drawn by the district court, thus indicating, to my mind, that the majority not only approves the district court's thesis but is influenced by it to affirm. I therefore think that comment by me is warranted.
 
 I.
 
 19
 Oysters in the oyster beds leased by taxpayers and sold by them to the consuming public are not gathered by the taxpayers' principals. They are harvested by lessees and independents from whom the taxpayers "purchase" the oysters. In the proceedings in the district court, the government conceded that, for the purposes of the case, independents were self-employed and not subject to the tax imposed by FICA on taxpayers.[3] Indeed, the government had never asserted liability on the part of the taxpayers for the tax with respect to independents.
 
 
 20
 As we were told when this appeal was argued, the government took this position because the independents by self-assessment were paying the tax. Having obtained this concession, the district court directed all of its attention to a consideration of whether the lessees' employment status was distinguishable from that of the independents. Finding them not distinguishable, it concluded that lessees were likewise not employees.
 
 
 21
 To my mind, the district court completely missed the point. The issue before it was whether the lessees were employees for the purposes of FICA; the issue was Not whether lessees should be accorded different tax treatment from the independents. The government's concession, made for compelling practical reasons, is too insubstantial a reed on which to construct the judgment in this case.
 
 II.
 
 22
 As the majority correctly observes, the question of who is an employee must be judged by maritime law. This is true because the harvesting of oysters is a traditionally maritime activity. Moore v. Hampton Roads Sanitation District Commission, 557 F.2d 1030, 1034-35 (4 Cir. 1977), (en banc) cert. denied, 434 U.S. 1012, 98 S.Ct. 725, 54 L.Ed.2d 755 (1978). United States v. Webb, Inc., 397 U.S. 179, 90 S.Ct. 850, 25 L.Ed.2d 207 (1970), holds that the status of persons engaged in maritime activities, for social security purposes, is to be determined by "maritime standards," 397 U.S. at 190, 90 S.Ct. 850, and that "(c)ontrol (of the putative employer over the putative employee) is probably the most important factor under maritime law, just as it is under the tests of land-based employment," 397 U.S. at 192, 90 S.Ct. at 856 (footnote eliminated). More importantly for present purposes, Webb added:[4]
 
 
 23
 It may be true that, in most maritime relationships, the workers enjoy discretion that is unusually broad if measured by land-based standards a discretion dictated by the seafaring nature of the activity. However, except where there is nearly total relinquishment of control through a bareboat, or demise, charter, the owner may nevertheless be considered, under maritime law, to have sufficient control to be charged with the duties of an employer. 397 U.S. at 192, 90 S.Ct. at 856.
 
 
 24
 Thus, Webb establishes that, for maritime employment, "control" is to be judged in the maritime context and that control may be found in the maritime context on facts which would be insufficient to establish control in land-based employment.
 
 III.
 
 25
 The majority reads and applies Webb to compel the conclusion that the lessees are not "employees" on the theory that the lessees are bareboat charterers. I think the record shows otherwise.
 
 
 26
 The term of the lessees' right to use taxpayers' boats is not fixed nor is their use of the boats unrestricted. Ordinarily a demise or bareboat charter gives the boat user the right to use the boat for a fixed period without any interference from the boat owner. In the instant case, while the lessees generally use their assigned boat for the whole of the oyster season, their lease is terminable by the owner at Any time for Any cause. Even while the lease is extant, the lessee cannot use his boat in an unrestricted manner. First, he must harvest oysters only from the beds leased by the taxpayer or from unleased state lands. Second, he is towed to and from the place of harvest by towboats owned and operated by taxpayers. Third, he must sell the oysters that he harvests to the taxpayer from which he rents the boat unless that taxpayer consents to a contrary disposition; otherwise, the taxpayer will cancel the lease. Fourth, if a lessee decides not to harvest on a particular day, taxpayers will assign his boat to someone else.
 
 
 27
 The rent paid by a lessee for the use of his boat is more indicative of an employee relationship with taxpayers than it is of a bareboat charter. Lessees, with rare exception, must and do sell their oysters to the taxpayer from which they obtain their boat. They pay "rent" of 10cents per bushel of oysters harvested, not exceeding $10 per week. No rent money ever actually changes hands. The rent is simply deducted from the amounts for oysters paid by taxpayers to the lessees.
 
 
 28
 Overall, the following picture emerges from this record: Taxpayers own and operate oyster houses. They sell oysters to the consuming public at wholesale and at retail. To conduct their business they require a steady supply of oysters throughout the oyster season. As to the lessees, they largely own or control the means of production, i. e. the oyster beds and the boats needed to harvest them. They depend upon the lessees for the manpower necessary to harvest the oysters. True, taxpayers exercise no over-the-shoulder supervision with regard to how the lessees perform their function. The nature of the task makes such supervision impractical even if taxpayers were disposed to undertake it. But from their control of the means of production and the restrictions placed on the lessees' use of those means, i. e. where to harvest, to whom to sell, etc., coupled with the fact that the "rent" for the boats is a function of the volume of production, I find myself in agreement with the Fifth Circuit in Bishop v. United States, 476 F.2d 977, 980 (5 Cir.), Cert. denied, 414 U.S. 911, 94 S.Ct. 234, 38 L.Ed.2d 149 (1973), that
 
 
 29
 (the lessees) are really a part of the owner's enterprise and all of the various parts of the arrangements are simply a means of calculating compensation.
 
 
 30
 The so-called independence of these masters from detailed orders on how to perform their work is beguiling. But this is not unique to the arrangement. This inheres in the calling of those who go down to the sea in ships. On the most obscure of vessels the master is the Lord of the Quarter Deck.
 
 
 31
 See also Anderson v. United States, 450 F.2d 567 (5 Cir. 1971), Cert. denied, 406 U.S. 906, 92 S.Ct. 1608, 31 L.Ed.2d 816 (1972); Kirkconnell v. United States, 347 F.2d 260, 171 Ct.Cl. 43 (1965).
 
 
 32
 Thus, I think that "control" in the maritime sense exists and is exercised. I would conclude that the lessees are "employees" within the meaning of FICA.
 
 
 
 *
 Their separate actions were consolidated at trial and on appeal
 
 
 [1]
 As the majority opinion sets out, oysters are harvested by oystermen, some of whom lease boats and motors from taxpayers and others of whom own their own boats and motors. I shall refer to the former as "lessees" and the latter as "independents."
 
 
 [2]
 The term "employee" for purposes of FICA is defined in 26 U.S.C. § 3121(d). The administrative gloss can be found in 26 C.F.R. § 31.3121(d)-1(c). While helpful, none of this definitional material is dispositive of the largely factual question before us
 
 
 [3]
 This is not to say, however, that the independents are not covered by the Social Security Act and that they escape payment of tax. By virtue of 26 U.S.C. § 1401(a), persons with income from self-employment must pay a tax similar in nature to that imposed by FICA (26 U.S.C. § 3101). One may speculate that had the lessee oysterman complied with § 1401(a), the government would not have made an assessment under FICA, and this litigation would not have followed
 
 
 [4]
 I note that, in quoting from Webb, the majority eliminates the first sentence in the quotation which follows in my text. To my mind, the majority's failure to appreciate its significance is the foundation of the majority's erroneous conclusion