T.C. Memo. 2006-242

UNITED STATES TAX COURT

ROBERT C. and PATRICIA C. HUMPHREY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19295-03L.                    Filed November 9, 2006.

        P-H, as vice president of i2 Technologies, Inc.
(i2), received incentive stock options (ISOs).  On Dec.
31, 1999, P-H resigned as i2's senior vice president of
marketing.  On Nov. 13, 2000, P-H exercised many of his
ISOs.

        Ps filed a joint Federal income tax return for
2000, wherein they reported ordinary gain for regular
income tax purposes from the exercise of the ISOs and
reported a regular income tax of $8,772,392.  Ps did
not fully pay the tax liability.  Ps subsequently
submitted to R an amended return for 2000 in which they
claimed they were not subject to regular income tax
upon the exercise of the ISOs because P-H was an
employee of i2 within 3 months of exercising the ISOs
as required pursuant to secs. 421(a) and 422(a)(2).  R
rejected Ps' 2000 amended return and issued to Ps a
notice of Federal tax lien.  Ps requested a hearing
under sec. 6330.  The Appeals Office rejected Ps'

arguments, and Ps timely petitioned this Court for review of R's lien action.

Held: P-H was not an employee within 3 months of exercising his ISOs for purposes of sec. 422(a)(2).

Brian Gary Isaacson and Don Paul Badgley, for petitioner.

Kirk M. Paxson, Julie L. Payne, and William C. Schmidt for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, Judge: Petitioners filed a petition with this Court in response to Notices of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330 for 2000. Pursuant to section 6330(d), petitioners seek review of respondent's determinations.[1] All references to petitioner in the singular are to petitioner Robert C. Humphrey. After concessions,[2] the

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code (Code), as amended. All Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. Amounts are rounded to the nearest dollar.

[2] Petitioners concede that nonrecourse debt incurred to purchase the stock which in turn was pledged to the lender to secure the debt resulted in the shares' being transferred to petitioner. See sec. 1.83-3(a)(2), Income Tax Regs.

Petitioners also concede that pursuant to sec. 1.83-1(e), Income Tax Regs., petitioner is not allowed an ordinary loss when his substantially vested stock was forfeited pursuant to a lapse restriction.

issues for decision are: (1) Whether pursuant to section 422(a)(2) petitioner remained an employee with i2 until 3 months prior to the exercise of his incentive stock options (ISOs); (2) if petitioner remained an employee of i2 until 3 months prior to exercising his ISOs, whether the capital loss limitations of section 1211 apply to the computation of alternative minimum taxable income (AMTI); (3) if petitioner remained an employee of i2 until 3 months prior to exercising his ISOs, whether alternative minimum tax (AMT) capital losses can be carried back as an alternative tax net operating loss (ATNOL) to reduce AMTI.

FINDINGS OF FACT

The parties' stipulation of facts and attached exhibits are incorporated herein by this reference, and the facts stipulated are so found. At the time the petition was filed, petitioners resided in Southlake, Texas.

A. i2 Employment and Stock Options

1. Employment with i2

Headquartered in Dallas, i2 is a Delaware corporation that develops and markets enterprise chain management solutions, including supply chain software and consulting services. In 1988, i2's founders created the company's first software program, which was groundbreaking in the supply chain management industry.

On February 3, 1995, petitioner was recruited as i2's vice president and eventually became i2's senior vice president of

marketing. As part of his compensation package, petitioner received a monthly salary of $10,000 and a $300,000 yearly bonus if his target goals were reached. Petitioner was also granted several stock options pursuant to i2's Stock Option Agreement (Agreement), which consisted of ISOs and nonstatutory stock options (NSOs). To the extent relevant to this case, these options are set forth in the table below:

| Option grant date | ISO or NSO as of date of option grant | Number of shares granted | Exercise price per share |
|---|---|---|---|
| 12/29/95 | ISO | 276,000 | $0.1475 |
| 12/15/97 | ISO | 78,272 | 5.10938 |
| 12/15/97 | NSO | 1,728 | 5.10938 |
| 10/21/98 | ISO | 28,696 | 3.48438 |
| 10/21/98 | NSO | 91,304 | 3.48438 |

The Agreement provided, among other things, that ISOs would cease to qualify for favorable tax treatment if (and to the extent) they were exercised more than 3 months after the date the employee/optionee ceased to be an employee of i2 for any reason other than death or permanent disability. The Incentive Stock Option Agreement (ISO Agreement), accompanying the Agreement, stated that if the ISOs did not qualify as an incentive stock option, there might be a regular Federal income tax liability upon the exercise of the option.

On December 17, 1999, the president of i2, Greg Brady, sent an e-mail to certain i2 employees announcing the resignation and retirement of petitioner effective December 31, 1999. The e-mail stated:

> To i2 Management:
>
> It is with great regret that I announce the resignation and retirement of Robert Humphrey from i2 effective December 31, 1999. Robert has been a strong and visible force during the critical growth of i2 for the past 4 1/2 years serving as our Vice President of Marketing. We will miss Robert's leadership, energy and passion.
>
> Robert is planning on taking time off with his family and then his focus will be on charitable work and personal investments.
>
> We are actively searching for a new VP of Marketing. In the interim, Jim Wilson will be assuming the leadership role for i2's Marketing organization.
>
> Please wish Robert well in the next stage of his life as we will surely miss him.

Sanjiv Sidhu, i2's CEO, responded to Mr. Brady's e-mail, advising him to send the e-mail to all i2 employees. On December 31, 1999, Mr. Humphrey's employment as i2's Senior Vice President of Marketing was terminated.

An employee termination form for petitioner was completed, identifying December 31, 1999, as his "Qualifying Event Date" and the qualifying event was "Termination or Reduction of Hours". On January 9, 2000, i2's benefits manager completed a Notice of Right to Convert Group Life Insurance for petitioner, identifying December 31, 1999, as his "Termination Date of Insurance and/or

Employment". It stated that the reason for termination of group insurance for petitioner was termination of employment.

In 2000, i2 paid petitioner a bonus for 1999 of $59,177. Of this amount, $36,035 was paid to petitioner on January 31, 2000, and $23,142 was paid to him on February 29, 2000. The i2 payroll register for the period ending February 29, 2000, showed petitioner's status as "TERMINATED".

2. Exercise of Stock Options

Almost 11 months after retiring, on November 13, 2000, petitioner acquired 346,000 shares of i2 stock by exercising his stock options. Pledging the stock as collateral, petitioner borrowed $3,555,045 from his brokerage house to pay the purchase price of the exercised ISOs and NSOs and a portion of the income tax liability owing from exercising the shares.[3] The stock so acquired was transferable and not subject to a substantial risk of forfeiture. Petitioner was not a dealer or trader in securities. The details of these transactions are set forth below.

| Option date and type of option | Shares exercised | Total exercise price | FMV on exercise date | FMV less exercise price |
|---|---|---|---|---|
| 12/29/95 ISO | 276,000 | $ 40,710 | $16,232,250 | $16,191,540 |
| 12/15/97 ISO | 39,136 | 199,961 | 2,301,686 | 2,101,725 |

---

[3] Petitioner also contributed $2,694,482 of his own funds to pay a portion of the balance of the tax liability.

| | | | | |
|---|---|---|---|---|
| 12/15/97 NSO | 864 | 4,415 | 50,814 | 46,399 |
| 10/21/98 NSO | 30,000 | 104,532 | 1,764,375 | 1,659,843 |

B.   2000 Federal Income Tax Returns

Petitioner filed his 2000 Federal income tax return on April 16, 2001, which was prepared by Henry, Held and Associates, P.C. The return reported wages of $20,243,699, taxable interest of $5,521, ordinary dividends of $190,346, capital gains of $3,587,913, miscellaneous income of $16,000, and, after a self-employment tax deduction of $215 and itemized deductions of $45,905, taxable income of $23,997,359.  The return reported regular tax of $8,772,392, AMT of zero, and a self-employment tax of $429.  After applying a foreign tax credit of $312 and total payments of $6,067,851, the remaining unpaid income tax liability was $2,704,658.  Respondent assessed the income tax liability on May 28, 2001.  Petitioner has not fully paid the balance.

On March 25, 2002, relying on the advice of Brian G. Isaacson, a tax attorney, petitioner filed a Form 1040X, Amended U.S. Individual Income Tax Return, amending his 2000 Federal income tax return (2000 amended return) with a Form 8275, Disclosure Statement.[4]  The 2000 amended return reported wage

_____

[4] The amended return prepared by Mr. Isaacson included a Form 8275, which contained Mr. Isaacson's tax opinion letter to petitioner.  To avoid certain penalties, Form 8275 is used by taxpayers to disclose items or positions that are not otherwise adequately disclosed on a tax return.  The form is filed to avoid the portions of the accuracy-related penalty due to disregard of
(continued...)

income of $244,190 rather than the $20,243,699 initially reported. Other than wage income, the 2000 amended return reported the same income and deductions as initially reported, resulting in regular taxable income of $3,997,850. The 2000 amended return reported a reduced regular tax of $852,586, AMT of zero, self-employment tax of $429, and after deducting the same foreign tax credit and total payments as initially reported, claimed a refund of $4,815,148. The 2000 amended return was not accepted by the Internal Revenue Service.

On April 15, 2003, petitioner filed a separate Form 1040X for 2000 containing the following statement:

> The taxpayer's original return erroneously reported an amount due based on an incorrect valuation and/or inclusion of stock options (both qualified and non qualified) and the incorrect application of the AMT net operating loss and AMT credit. A list of the legal grounds supporting the amended return's valuation of stock options and/or exclusion of such options from income along with the correct application of the AMT net operating loss and AMT credit is attached to this form. The application of the attached legal arguments to the taxpayer's stock option transactions will result in a change in the amount due for lines 1, 5 through 10, and 19 through 24 on the front of this 1040X form. The exact amount of the refund will be determined pending the final determination of facts and the release of a technical advice memo or court decision.

---

[4](...continued)
rules or regulations or to a substantial understatement of income tax for non-tax-shelter items if the return position has a reasonable basis.

C.    Collection Actions

Respondent filed a Notice of Federal Tax Lien on July 15, 2002.  On July 18, 2002, respondent mailed petitioners a Notice of Federal Tax Lien Filing and Your Right to a Hearing Under IRC 6320 (NFTL), regarding their unpaid 2000 taxes.  Petitioners submitted Form 12153, Request for a Collection Due Process Hearing, to respondent indicating that they contested the filed lien.  On their request, petitioners wrote only "see return amended pursuant to IRC 83(c)" as their reason for disagreeing with respondent's NFTL.

Petitioners' request for a hearing was assigned to an Appeals officer in Dallas, Texas.  Upon petitioners' request, the case was transferred to respondent's Seattle, Washington, Appeals Office and assigned to Denise Mountjoy.  On September 30, 2003, Appeals Officer Mountjoy had a conversation with petitioners' counsel, Mr. Isaacson, during which she declined to consider petitioner's request for relief because she could not consider their underlying liability.  On October 8, 2003, respondent issued a Notice of Determination Concerning Collection Action(s), sustaining the lien against petitioners.

Petitioner timely filed a petition for lien or levy action with the Court on November 12, 2003.  On August 19, 2004, this case was set for trial during the January 24, 2005, Trial Session in Seattle, Washington.  On November 8, 2004, respondent moved

for a continuance and remand. On December 8, 2004, the Court retained jurisdiction and remanded this case to respondent's Appeals Office for another administrative hearing to consider petitioner's underlying tax liability for the years at issue.

On March 2, 2005, Appeals Officer Mountjoy held an administrative hearing with Mr. Isaacson during which he argued that: (1) The stock at issue was not transferred to petitioner because it was pledged to a lender as security for nonrecourse debt;[5] and (2) petitioner continued his employment with i2 after his resignation and termination on December 31, 1999, until October 2000, and as a result, the exercise of the options qualified for nonrecognition of income pursuant to section 421.

During the conference, Mr. Isaacson said he would provide additional documents to support petitioner's claim that he continued his employment with i2 after December 31, 1999, and provide a declaration from petitioner's former boss, Greg Brady, which would indicate that Mr. Brady accepted petitioner's resignation in December 1999 and petitioner continued on as an employee with i2 after January 2000.

On April 19, 2005, Appeals Officer Mountjoy mailed a letter to Mr. Isaacson requesting him to submit the documentation and declaration supporting petitioner's claim. On August 1, 2005,

---

[5] This issue has been conceded. See supra note 2.

Appeals Officer Mountjoy received Mr. Brady's declaration,[6] and on August 12, 2005, she received a letter from Mr. Isaacson stating no further documentation would be submitted.

Appeals Officer Mountjoy examined all available information and issued a Supplemental Notice of Determination on September 28, 2005, which rejected petitioners' challenge to the amount of the underlying tax liability reported on their original 2000 return. Respondent has not issued a notice of deficiency for the years at issue. This case was tried during the October 31, 2005, Trial Session in Seattle, Washington.

OPINION

A.    Standard of Review

To determine the correct standard of review in a case instituted under sections 6320 and 6330, the Court must first decide whether petitioner's underlying tax liability is properly at issue. Sego v. Commissioner, 114 T.C. 604, 610 (2000); Goza v. Commissioner, 114 T.C. 176, 181-182 (2000). The term "underlying tax liability" under section 6330(c)(2)(B) includes amounts self-assessed under section 6201(a), together with penalties and interest. Sec. 6201(a); Montgomery v. Commissioner, 122 T.C. 1, 9 (2004); sec. 301.6203-1, Proced. & Admin. Regs.

---

[6] Mr. Brady's declaration was not received into evidence, and he did not appear to testify at trial.

The amount of the underlying tax liability may be placed at issue if the taxpayer did not receive a statutory notice of deficiency or otherwise have an opportunity to dispute the tax liability.  Sec. 6330(c)(2)(B); see Behling v. Commissioner, 118 T.C. 572, 576-577 (2002).  In this case, petitioners were not issued a notice of deficiency and did not have a prior opportunity to dispute the tax liability.  Therefore, the proper standard of review for the arguments challenging the underlying tax liability is de novo.  Sego v. Commissioner, supra at 609-610.

B.   ISOs and the Employee Requirement Under Section 422(a)(2)

Petitioner's original 2000 return reported ordinary gain resulting from the exercise of his ISOs for 315,136 shares pursuant to section 83.[7]  Petitioner now contends that he was employed by i2 within 3 months of exercising his options as required under section 422(a)(2), allowing him to apply section 421(a) to the transactions so that he does not have to recognize the ordinary gain reported on his original 2000 return.[8]

Respondent argues petitioner was not an employee of i2 within 3 months of exercising his ISOs, and section 83, not

---

[7] Petitioner was granted options to acquire 346,000 shares of stock, 315,136 of which were ISOs and 30,864 were NSOs.

[8] Petitioner does not allege, and the record does not suggest, that his ownership right in his i2 stock was nontransferable or subject to a substantial risk of forfeiture when he exercised his options on Nov. 13, 2000.

section 421(a), applies to the exercise of the ISOs.  Thus, respondent contends that petitioners properly reported the gain recognized from exercising those ISOs as ordinary income for regular tax purposes on their original 2000 return under section 83.

Section 421(a) provides that, if the requirements of section 422(a) are met, a taxpayer does not recognize income either upon the granting[9] of an ISO to the taxpayer or when the stock is transferred[10] to the taxpayer upon exercise of an ISO. Recognition of income is deferred until disposition of the stock.[11]  Sec. 421(a); sec. 14a.422A-1, Q&A-1, Temporary Income Tax Regs., 46 Fed. Reg. 61840 (Dec. 21, 1981).  If the requirements of section 422(a) are satisfied, gain on the sale of the stock is characterized as capital gain.[12]  Secs. 1221 and 1222; sec. 14a.422A-1, Q&A-1, Temporary Income Tax Regs., supra.

---

[9] The date on which an ISO is granted is the date on which all corporate action necessary for the grant of the ISO is completed.  Sec. 1.421-7(c)(1), Income Tax Regs.

[10] For purposes of secs. 421 through 424, the term "transfer" means the transfer of ownership or substantially all rights of ownership of a share of stock to an individual pursuant to his exercise of a statutory option.  Sec. 1.421-7(g), Income Tax Regs.

[11] A disposition of ISO stock generally means any sale, exchange, gift, or transfer of legal title to, the stock.  Sec. 424(c)(1).

[12] New regulations under sec. 422 became effective Aug. 3, 2004, but they are not applicable to this case.  Sec. 1.422-5(f), Income Tax Regs.

Section 422(a)(2)[13] requires the taxpayer to be an employee of the corporation granting the option at all times from the date the option is granted until 3 months before the date of exercise.[14]  Sec. 422(a)(2).  If the taxpayer exercises his ISOs more than 3 months after termination of employment from the grantor corporation, section 83, not section 421, applies to the transfer of stock.  Secs. 421(a); 83(e)(1); sec. 1.83-7, Income Tax Regs.

Section 83(a) provides in pertinent part that if property is transferred to a taxpayer in connection with the performance of services (e.g., stock transferred to a taxpayer upon the exercise of a stock option), the excess of the fair market value of the stock (measured as of the first time the taxpayer's rights in the stock are transferable or are not subject to a substantial risk of forfeiture) over the amount, if any, paid for the stock (the exercise price) shall be included in the taxpayer's gross income in the first taxable year in which the taxpayer's rights in the stock are transferable or are not subject to a substantial risk

---

[13] Sec. 422(a)(1) is not at issue.

[14] The taxpayer may also be a employee of a parent or subsidiary corporation of the corporation granting the stock option, or a corporation or a parent or subsidiary corporation of such corporation issuing or assuming a stock option in a transaction to which sec. 424(a) applies.  Sec. 422(a)(2).

of forfeiture.[15]  See <u>Tanner v. Commissioner</u>, 117 T.C. 237, 242 (2001), affd. 65 Fed. Appx. 508 (5th Cir. 2003); sec. 1.83-7(a), Income Tax Regs.

Petitioner argues he continued his employment with i2 in an advisory capacity through October 2000.  In support of his argument, petitioner testified that, when he expressed his desire to leave i2, he was pressured by i2's president, Mr. Brady, to remain with the company until a replacement could be found.  After December 31, 1999, his primary role was to assist in finding a replacement and to a lesser extent, assist with business development, media and analyst relations, and establishing a new venture company.  As compensation for remaining with i2, he would receive his full 1999 bonus and permission to exercise his stock options without restriction.

---

[15]  Section 83(a) may apply to a nonqualified stock option as follows:

> If there is granted to an employee or independent contractor * * * in connection with the performance of services, an option to which section 421 * * * does not apply, section 83(a) shall apply to such grant if the option has a readily ascertainable fair market value * * * at the time the option is granted.  * * * .  If section 83(a) does not apply to the grant of such an option because the option does not have a readily ascertainable fair market value at the time of grant, sections 83(a) and 83(b) shall apply at the time the option is exercised or otherwise disposed of, even though the fair market value of such option may have become readily ascertainable before such time. * * * [Sec.  1.83-7(a), Income Tax Regs.]

The taxpayer has the burden of proving the existence of an employment relationship.  Rule 142(a); Ellison v. Commissioner, 55 T.C. 142, 152 (1970).

Similar to section 422(a)(2), section 1.421-7(h)(1) and (2), Income Tax Regs., provides that for purposes of determining whether section 421 applies to a statutory option,[16] the taxpayer must be an employee of the corporation granting the option at all times from the date the option is granted until 3 months before the date of exercise.  To determine whether the taxpayer is an employee, the rules contained in section 3401(c) and the regulations thereunder are applicable.  Sec. 1.421-7(h)(1), Income Tax Regs.

Section 3401(c) and the regulations thereunder define "employee" for purposes of withholding from wages.  In relevant part, section 31.3401(c)-1(b), Employment Tax Regs., provides:

> (b) Generally the relationship of employer and employee exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is

---

[16] The term "statutory option" means "a qualified stock option, as defined by section 422(b)".  Sec. 1.421-7(b)(1), Income Tax Regs.  Sec. 422(b) defines an "incentive stock option".

also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is not an employee.

In United States v. W.M. Webb, Inc., 397 U.S. 179, 194 (1970), the Supreme Court stated with respect to section 31.3121(d)-1(c)(2), Employment Tax Regs., which has language almost identical to section 31.3401(c)-1(b), that "the regulation provides a summary of the principles of the common law, intended as an initial guide for determination * * * [of] whether a relationship 'is the legal relationship of employer and employee.'" The regulations applicable to this case, section 31.3401(c)-1(b), Employment Tax Regs., adopt the common law test for purposes of determining when an employee-employer relationship exists.[17] Taylor v. Commissioner, 71 T.C. 124, 127 (1978).

Whether an individual is a common law employee is a question of fact,[18] to be determined applying the following factors: (1) The degree of control exercised by the principal; (2) which party

_____

[17] An exception to the common law test may apply in situations involving leaves of absence. See sec. 1.421-7(h)(2), Income Tax Regs.

[18] Ellison v. Commissioner, 55 T.C. 142, 152 (1970).

invests in work facilities used by the individual; (3) the opportunity of the individual to realize profit or loss; (4) whether the principal can discharge the individual; (5) whether the work is part of the principal's regular business; (6) the permanency of the relationship; and (7) the relationship the parties believed they were creating.  Ewens & Miller, Inc. v. Commissioner, 117 T.C. 263, 270 (2001); Weber v. Commissioner, 103 T.C. 378, 387 (1994), affd. 60 F.3d 1104 (4th Cir. 1995); Potter v. Commissioner, T.C. Memo. 1994-356.  No single factor is dispositive.  Ewens & Miller, Inc. v. Commissioner, supra.

(1) Degree of Control

The "degree of control" test requires the Court to examine not only the control exercised by an alleged employer, but also the degree to which the alleged employer may intervene to impose control.  Weber v. Commissioner, supra at 387-388.

Petitioner testified he was constrained by the same controls and expectations while operating as an adviser as during his position as senior vice president of marketing.  The record does not establish that i2 exercised control or had the capacity to impose control over petitioner after his retirement on December 31, 1999.  On the contrary, the record indicates i2 lacked control because petitioner did not have the same responsibilities after December 31, 1999; his previous position was filled by another i2 employee; he no longer had an office with the company;

he did not have a budget; he was not required to work a certain number of hours or particular days of the week; and he held positions with other noncompeting companies in 2000. The absence of control indicates the absence of an employee-employer relationship after December 31, 1999.

### (2) Investment in Facilities

The fact that a worker provides his or her own tools generally indicates a nonemployee status. Ewens & Miller, Inc. v. Commissioner, supra at 271. Petitioner testified after December 31, 1999, he worked primarily for i2 at home using his own computer and telephone. Petitioner did not produce evidence indicating i2 provided a facility to work, equipment, supplies, or money for work-related expenses such as travel and phone usage. This factor is not indicative of an employee-employer relationship between i2 and petitioner after December 31, 1999.

### (3) Opportunity for Profit or Loss

A worker's opportunity to earn a profit and assume risk of loss may indicate a nonemployee relationship. Simpson v. Commissioner, 64 T.C. 974, 988 (1975). On the other hand, earning an hourly wage or salary indicates an employee-employer relationship exists. Del Monico v. Commissioner, T.C. Memo. 2004-92; Kumpel v. Commissioner, T.C. Memo. 2003-265.

After December 31, 1999, i2 did not pay petitioner either a salary or an hourly wage. Petitioner testified his compensation

for advisory services was receiving the full amount of his 1999 bonus without having to negotiate the amount, and i2 would refrain from interfering with his ability to exercise his i2 stock options. However, the record indicates petitioner's bonus was already established and set forth in his 1995 employment compensation package and indicates i2 did not have the legal right to limit petitioner's ability to exercise his stock options, unless he started working for a competing company soon after departing i2.

The record also fails to show he had any opportunity to earn a profit or to risk loss. This factor indicates an absence of an employee-employer relationship.

### (4) Right To Discharge

The record is silent with respect to whether i2 retained the right to discharge petitioner. Petitioner expressed only that he would be terminated from his advisory role when a replacement was found. This factor is neutral.

### (5) Integral Part of Business

Petitioner's testimony indicates his post December 31, 1999, services were mostly advisory in nature on issues peripheral to i2's principal business of creating supply chain management solutions. This factor indicates an absence of an employee-employer relationship.

(6) <u>Permanency of the Relationship</u>

A relationship established to accomplish a specified objective is not indicative of an employment relationship. <u>Ellison v. Commissioner</u>, 55 T.C. at 155. A transitory work relationship may point toward a nonemployee status. <u>Ewens & Miller, Inc. v. Commissioner</u>, <u>supra</u> at 273.

Petitioner testified neither he nor i2 contemplated a continuing relationship. He asserted his advisory position began in January 2000 and terminated in October 2000, when his replacement was found. The continued relationship was for a brief period and merely to accomplish a specific objective. This factor indicates an absence of an employee-employer relationship.

(7) <u>Relationship the Parties Thought They Created</u>

Petitioner argued at trial and in brief that he and Mr. Brady created a new employee-employer relationship before he retired on December 31, 1999, which lasted until October 2000. The record indicates no such relationship was created with i2 after his retirement.

An e-mail written by Mr. Brady to i2's management praising petitioner's accomplishments stated petitioner's termination was effective December 31, 1999. In response, i2's CEO asked Mr. Brady to send the e-mail to all employees of i2. Furthermore, petitioner's Employee Termination Form and Notice of Right to Convert Life Insurance stated he was terminated on December 31,

1999, and i2's February 29, 2000, payroll register stated petitioner was terminated.  The evidence indicates an employee-employer relationship did not exist after December 31, 1999.

None of the factors listed above support petitioner's position.  Considering all of the facts and circumstances, this Court finds petitioner was not a common law employee of i2 after he retired on December 31, 1999, and was not an employee within 3 months of exercising his ISOs on November 13, 2000, for purposes of section 422(a)(2).  As a result, section 421 did not apply to the exercise of petitioner's ISOs on November 13, 2000, and section 83 did.

The remaining issues will not be addressed because they rely upon this Court's finding petitioner was an employee within 3 months of exercising his ISOs for purposes of section 422(a)(2).

In reaching these holdings, the Court has considered all arguments made and, to the extent not mentioned, concludes that they are moot, irrelevant, or without merit.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered for respondent</u>.